KANAWHA BANKING AND TRUST COMPANY,

EXECUTOR, *et al.*

*v.*

JOHN GILBERT, *et al.*

(No. 9873)

Submitted September 23, 1947. Decided December 20, 1947.

Fox, PRESIDENT, dissenting.

*M. O. Litz* and *Harold A. Ritz,* for appellants.

*J. M. Woods* and *Spilman, Thomas & Battle,* for appellees.

HAYMOND, JUDGE:

This case is here on appeal from the final decree of the Circuit Court of Wyoming County, entered February 18,

1946, which granted to the plaintiffs the relief prayed for in their bill of complaint. The plaintiffs, Kanawha Banking and Trust Company, and others, are the representatives and the beneficiaries of the deceased members of the one time law firm of Couch, Flournoy and Price. The defendants are John Gilbert, Francis L. Plumley and Samuel H. Gilbert, Trustees, successors to the original trustees, and numerous other persons as beneficiaries under a deed dated November 21, 1882, made by Theresa E. Patterson, Trustee, and others, to William G. Boulton, Charles S. Whelan and Francis Lasher, Trustees, which conveyed a tract of 36,750 acres of land in Wyoming and McDowell Counties, West Virginia, in trust for the purposes stated in that deed. The principal issue involved is the character and the legal effect of a written contract, dated December 15, 1896, entered into between attorneys and clients, the parties to which, as clients, were Charles S. Whelan, George F. Lasher and John Wagner, Trustees, and, as attorneys, the law firm of Couch, Flournoy and Price, of Charleston, then composed of George S. Couch, S. L. Flournoy, George E. Price and Harrison B. Smith. George S. Couch soon afterwards retired as a member of the firm and Harrison B. Smith succeeded to his interest under the contract. All the members of the firm died prior to February, 1944, the date of the institution of this suit.

The bill of complaint, which was later amended by a court order, in substance alleges that the contract conferred upon the attorneys a vested undivided one tenth interest in the 36,750 acres of land and prays for the adjudication of that interest in favor of them and their successors and beneficiaries. The defendant trustees, by their answer, denied that the contract vested in the attorneys any interest in the land and charged that the contract by its terms provided that the payments of ten per cent of the proceeds derived from the sales and the income from the land were to be made for future legal services to be rendered by the attorneys. By that part of their answer which is in the nature of a cross bill the answer-

ing defendants alleged that there was fraud upon the part of the firm in the procurement of the contract, and that the payments of ten per cent were in excess of a reasonable compensation for the legal services rendered, and prayed for judgment in their favor against the plaintiffs for the amount paid which exceeded a fair compensation for the services rendered by the attorneys under the contract. The plaintiffs by their answer denied this claim of the defendants in their answer in the nature of a cross bill. Other defendants filed an answer, which was also in the nature of a cross bill, to which the plaintiffs filed a replication and an answer, and the defendants filed their replications to the answers of the plaintiffs to the cross bills of the defendants. The defendant trustees, at the time of oral argument and submission of the case in the circuit court, filed a supplemental answer to which the plaintiffs replied generally. The issues raised by these subsequent pleadings were substantially those presented by the original bill of complaint, answer and replication.

The case was heard upon the foregoing pleadings, upon the issues joined, and upon depositions taken and filed respectively by the plaintiffs and the defendants. The depositions in behalf of the plaintiffs, to which the defendants duly objected, consisted in the main of letters passing between some of the attorneys and between them and some of the trustees before and after the execution of the written agreement of December 15, 1896, and other writings, which were offered by the plaintiffs to sustain their contention that its meaning and effect were to confer upon the attorneys a vested interest in the land.

By its final decree the circuit court held that the letters and the other documents offered by the plaintiffs were admissible; that the contract of December 15, 1896, granted to the law firm of Couch, Flournoy and Price an equitable title to an undivided one tenth of the tract of 36,750 acres of land, and that the claim of the defendants for the recovery of payments made by them which were alleged to be in excess of a reasonable amount for the services rendered by the attorneys under the contract should be

denied. It also held that the defendant trustees were accountable to the plaintiffs for ten per cent of the net proceeds received by them from the land for which they had not accounted; that in future distributions they should account to the plaintiffs for dividends and for ten per cent of the net proceeds hereafter realized from the land; and that the plaintiffs recover their costs from the defendants. The decree further provided that neither the costs awarded the plaintiffs nor the costs incurred by the defendants should be paid from the interest of the plaintiffs in the proceeds realized from the land, and that the costs were a personal liability of the beneficiaries claiming under the deed of November 21, 1882, and a lien upon their respective interests in the unsold portion of the 36,750 acre tract of land, which now comprises about 20,600 acres.

To reverse the final decree of the circuit court the defendants who prosecute this appeal assign these errors: (1) Denial of the claim of the defendants; (2) admission of extrinsic evidence to change, vary and modify the written contract of December 15, 1896; (3) adjudication that the contract vested in the firm of Couch, Flournoy and Price ten per cent of• all the property held by the trustees and that their rights did not terminate upon the death of Harrison B. Smith; and (4) rejection of the contention of the defendants that the contract was for personal services and ended with the death of the last surviving member of the firm.

A complete and detailed narrative of the events which led to the making of the contract and those which followed it until the institution of this suit, a period of more than seventy years, is unnecessary to the decision of the questions upon which this case turns and would unduly extend the length of this opinion. A summary of the most important matters, however, is proper to present and clarify the material facts and circumstances.

Though the prior history of the 36,750 acre tract of land, which goes back to two original patents from the Com-

monwealth of Virginia to Robert Morris for 320,000 acres and 480,000 acres in 1795, is interesting, the beginning point, for the purposes of this case, is the year 1871. At that time, as part of a tract of 45,150 acres, the tract of 36,750 acres was sold by the Sheriff of McDowell County for delinquent taxes for the year 1869, in the name of Michael Bouvier. This sale was later held to be void because of fatal defects and irregularities with which it was affected.

In 1881, in a school land proceeding in the Circuit Court of Wyoming County forty seven parcels of the 36,750 acre tract, aggregating 23,092 acres, were sold and conveyed to L. B. Cook, John W. McCreery, Joseph Short, William Short, A. J. Ellis and R. T. Lusk.

By deed dated November 21, 1882, Theresa E. Patterson, Trustee, and others, conveyed the 36,750 acre tract to William G. Boulton, Charles S. Whelan and Francis S. Lasher, Trustees, and their successors, in trust: "to hold the same until a favorable opportunity, in the discretion of said Trustees, shall appear to sell and dispose thereof, and, then, with the written consent of the parties interested in the proceeds of such sale, to grant and convey said premises, or parts and parcels thereof, so sold to the purchasers thereof, their heirs and assigns forever, free and clear of any trust whatsoever", and to distribute the net proceeds among the beneficiaries as provided by the deed.

On June 28, 1890, William G. Boulton, Charles S. Whelan and Francis S. Lasher, Trustees, by J. R. Sypher, of Philadelphia, and Knight and Couch, of Charleston, as their counsel, instituted a suit in the Circuit Court of the United States for the District of West Virginia, against John W. McCreery, L. B. Cook and others, to cancel the sales made to them in the earlier proceeding in the Circuit Court of Wyoming County. The bill prayed for the cancellation of the sales and the conveyances of the forty seven parcels which aggregated 23,092 acres of the 36,750 acre tract and of other acreages to the extent that they

were claimed to be within it. Later an amended bill was filed which prayed for cancellation of the tax sale of the 36,750 acre tract made by the Sheriff of McDowell County in 1871. The case was prepared for hearing by Sypher and Knight and Couch. At that point the defendant McCreery settled his claim to 8,000 acres of the lands sold and released his right to the trustees. Thereafter, the firm of Couch, Flournoy and Price, composed of George S. Couch, of the firm of Knight and Couch, S. L. Flournoy, George E. Price and Harrison B. Smith, and Sypher were employed by the trustees to continue the conduct of the case. The suit was prosecuted to a successful conclusion and a decree in favor of the trustees was entered in the trial court which upon appeal was affirmed on May 5, 1896, by the United States Circuit Court of Appeals.

After the final decision of the case a disagreement arose between the trustees and the attorneys as to their fees. Negotiations by letters, between S. L. Flournoy for the firm of Couch, Flournoy and Price and J. R. Sypher, among them and some of the individual trustees, and by conferences among J. R. Sypher and the trustees, occurred which, after a considerable period of time, resulted in the written contract between the trustees and the firm of Couch, Flournoy and Price, dated December 15, 1896, and a separate written agreement between the trustees and J. R. Sypher, dated December 22, 1896. The fee asked by the attorneys was fifteen thousand dollars. The trustees indicated that they could then make available in cash a sum not to exceed five thousand dollars less the sums previously paid by them to the attorneys. It appears that at that time thirteen hundred dollars had been paid to the firm and nine hundred and sixty dollars to Sypher and the residue of five thousand dollars, or twenty seven hundred and forty dollars, was to be paid to the firm in the amount of twelve hundred dollars and to Sypher in the amount of fifteen hundred and forty dollars. By this arrangement the firm and Sypher should each receive in cash the sum of twenty five hundred dollars. An agreement was finally reached and the written contracts just

mentioned resulted. The residue of ten thousand dollars of the initially requested fee of fifteen thousand dollars which would have been equally divided between the firm and Sypher was never paid.

The contract of December 15, 1896, between the trustees as parties of the first part, and the law firm as parties of the second part, which forms the basis of this litigation, set out in full in the bill of complaint and introduced in evidence by the plaintiffs, omitting the first paragraph, which contains the date and the names and the residences of the parties, the testimonium, the signatures of the parties, and the certificates of acknowledgement, is in these words:

"Witnesseth: That the parties of the first part agree to pay to the parties of the second part upon the execution of this agreement the sum of Twelve Hundred ($1200.00) Dollars in full of services in all matters up to this time. And said parties of the second part agree to accept said sum as payment in full for such services.

"The parties of the first part agree to pay to the parties of the second part the further sum of One Hundred and twenty-four dollars and sixty-two cents ($124.62) in full of costs and expenses paid by them up to this time.

"It is further agreed that the parties of the second part are to continue to represent as their attorneys the parties of the first part, and their successors as Trustees and beneficiaries in the trust, in all suits and matters pertaining to the lands now owned by the parties of the first part in the Counties of McDowell and Wyoming, West Virginia, so long as said lands, or any part thereof, shall be owned by said parties of the first part, their successors or the beneficiaries aforesaid, and that the parties of the second part in full payment of their services aforesaid shall be paid all traveling and other expenses incurred by them in attending to the said business, and also ten per cent (10%) of all sums which shall be hereafter received by the said parties of the first part, their successors or said beneficiaries (it being

understood and agreed as to the beneficiaries as is hereinafter expressed) in payment for damages and from leases or sales of the timber on or minerals in said lands, and from leases and sales of said lands, or any part of them, after deducting from the sums which shall be so received by the said parties of the first part, their successors or said beneficiaries, all expenses and costs and all taxes which shall be hereafter paid by said Trustees, their successors or said beneficiaries and after also deducting any and all payments which shall hereafter be made by said Trustees, their successors or said beneficiaries, in settlements with other claimants of said lands, or any part of them, and also after deducting any expenses paid to the said parties of the second part, as hereinbefore provided. It being understood and agreed that the trustees having paid to the parties of the second part the ten per centum herein named that then the ninety per centum remaining for distribution among the beneficiaries shall not in the said beneficiaries hands be subject to any further payment to the parties of the second part. The intention being that the said parties of the second part shall receive ten per cent of all amounts received hereafter by the parties of the first part, their successors or by said beneficiaries (if said beneficiaries shall have received any amounts of money for said lands and so forth without the ten per centum herein named having first been paid by the trustees) from said lands by way of damages, leases and sales, after deducting from said sums all taxes, charges, costs and expenses which shall hereafter be paid by the said parties of the first part, their successors or said beneficiaries.

"It being understood and agreed that the parties of the first part, in making this agreement, are acting as Trustees under a Deed of Trust dated the twenty-first day of November A. D., 1882, recorded in Wyoming County, West Virginia, September 7th, A. D. 1889 in the office of the County Clerk and that they are promising only to the extent that they are warranted in so doing by the deed and by virtue of an authorization in these words:

"I, the undersigned, a shareholder of the lands in West Virginia of which the legal title is held by Charles S. Whelan, John Wagner and George F. Lasher, as Trustees hereby consent to the arrangement made by the trustees that for future Legal Services a sum equal to ten per cent of all moneys to be received by said Trustees or their successors from the sale of the lands and lumber, from damages, leases, &c., shall be paid to Messrs. Couch, Flournoy & Price of Charleston, West Virginia, and J. R. Sypher of Philadelphia in the proportion of 7-1/2 per cent. to Couch, Flournoy & Price and 2-1/2 per cent. to J. R. Sypher.

| Name | No. of Shares | Date |
|------|---------------|------|

which authorization has been signed by a majority in interest and in number of the beneficiaries or shareholders and it being understood and agreed that the party of the first part shall not be held liable for any default on the part of their successors or on the part of the beneficiaries or any of them, and that, in their private capacity, they shall not be in any way liable hereunder and that they shall not be liable to respond in their own proper goods by reason of any exercise herein of authority beyond that which has been conferred upon them by reason of any promise made herein except that as beneficiaries they shall be liable to pay to the party of the second part ten per centum of any sums of money which they shall have received from the land and so forth as named in this agreement, which sums of money so received, shall not, before receipt by them as beneficiaries have been diminished by the payment to the party of the second part, of the ten per centum herein named and

"It being understood and agreed that each beneficiary's liability hereunder, whether he is or is not a Trustee is limited to ten per centum of the sums of money which he shall have received from the lands and so forth named herein, which sums so received, shall not, before receipt by him have been diminished by the ten per centum aforesaid."

The amounts specified in the contract were paid to the firm by the trustees.

A separate written agreement was made between the trustees and J. R. Sypher, dated December 22, 1896, by which the parties agreed that the trustees should pay to him fifteen hundred and forty dollars less seven hundred and ten dollars and sixty nine cents with interest from March 1, 1895, which he had assigned to his creditor, Bradford Smith, and certain costs, in full payment of his services to the date of the agreement and by which it was provided that future services rendered by him pertaining to suits and other matters in connection with the lands of the trustees in McDowell and Wyoming Counties should be considered as services rendered to Couch, Flournoy and Price and that he should look to them for payment for such services.

Until the making of the foregoing contract the negotiations in behalf of the firm with respect to the item of fees were conducted by S. L. Flournoy. He died January 28, 1904, and after his death they were directed by George E. Price.

The documents which the trial court admitted as evidence show that Mr. Price carried on correspondence from time to time with the trustees or their successors concerning the operation of the contract with respect to the payment of the fees claimed by the firm. On January 19, 1911, Price wrote to Lasher, one of the trustees, and suggested that a corporation be formed to take title to the land in order to close the trust and that the firm should receive ten per cent of the stock. No corporation was formed and the proposal never developed beyond the state of discussions during a considerable period of time.

In January, 1913, Lasher requested Price to give him his interpretation of the contract with respect to its termination. Price replied and expressed the view that the contract gave the firm an equitable interest in the land amounting to one tenth of the proceeds derived from it. This view he repeated in a letter written to John Gilbert

in 1917 after Gilbert had become one of the successor trustees. In 1918 he again wrote to Gilbert, gave advice relating to the proposed incorporation, and repeated his previously stated position concerning the interest claimed by the firm. In October, 1918, by letter, Price offered to reduce the ten per cent interest, to which he insisted the firm was entitled, to eight and one half per cent of the proceeds from the lands, but this offer was not acted upon and was later withdrawn.

In December, 1921, in answer to a request from Gilbert for a statement of the amount which the firm would be willing to take for its interest under the contract of December 15, 1896, Price insisted on its right to ten per cent of the proceeds of the sales and this position was reiterated in two later letters to Gilbert, in March, 1922. It also appears that at one time during these discussions the firm signed an agreement of incorporation and forwarded it to the trustees. That agreement, however, was not concluded and it was later returned by the trustees.

In 1923, a sale was negotiated by the trustees for 5,532 acres of the 36,750 acre tract to Fordson Coal Company at the price of $92.50 per acre, for the aggregate sum of $511,710.00, and in 1929, a second sale was negotiated by them for 9,410.57 acres of the land to H. C. Booz for the sum of $531,422.80. In concluding these transactions separate proceedings were instituted in the Circuit Court of McDowell County to settle any questions concerning the consent of a majority of the beneficiaries to the transfer of the title to the lands sold, and for the purpose of approving the sales the then surviving members of the firm and the beneficiaries of the estate of S. L. Flournoy were made defendants in each proceeding, and they gave their written consent to each sale. The firm, then consisting of George E. Price and Harrison B. Smith, as its surviving members, received ten per cent of the net proceeds of the first sale exclusive of expenses. It also received ten per cent of the net proceeds of the second sale exclusive of a large sum which was withheld from the

sellers to provide against certain contingencies which at the time appeared likely to arise.

Mr. Price died in February, 1938, and after his death correspondence relative to the meaning and the effect of the written contract was continued with the trustees by Harrison B. Smith in behalf of the firm. From the correspondence between Gilbert and Smith, it appears that the trustees consulted an attorney in Philadelphia who advanced the opinion that the contract would terminate upon the death of the last survivor of the firm of Couch, Flournoy and Price. Following the death of Harrison B. Smith, which occurred October 18, 1942, Gilbert wrote a letter to the representatives of the estate of Harrison B. Smith, in which he expressed the opinion that the death of Smith terminated the arrangement created by the written agreement and offered to pay to the firm the sum of $4,406.77, which was stated to be the unpaid residue of ten per cent of the net proceeds from the land collected and apportioned to October 18, 1942. This offer was refused and the institution of this suit followed.

The amounts paid to the firm by the trustees, from time to time, exclusive of the sum of $4,406.77, aggregate $140,-109.59. The firm accounted to J. R. Sypher for his share of the fees and to his widow after his death. By deed of assignment dated April 15, 1913, the widow of J. R. Sypher conveyed all her right, title and interest as executrix of his will and as beneficiary of his estate in the contract of December 15, 1896, and in the 36,750 acre tract of land, to George E. Price and Harrison B. Smith for the cash consideration of $3,277.89.

Other incidents are disclosed by the letters and the documents offered in evidence by the plaintiffs to support their contention that the contract conferred a vested interest in the land in the firm and for the purpose of establishing that meaning and effect of the contract, which tend to show acquiescence by the trustees in the position asserted by the plaintiffs. These matters have been given

careful consideration, but it is not deemed necessary to mention or to discuss them in detail.

The controlling issue in this suit is the meaning and the legal effect of the written agreement of December 15, 1896, between the trustees and the law firm. It in turn gives rise to the question of the admissibility of the numerous and voluminous letters and documents introduced by the plaintiffs for the primary purpose of establishing their contention that the contract operated to confer upon the firm a vested interest or estate in the 36,750 acres of land, and for the additional purpose of answering the charge of fraud upon the part of the firm in the creation of the contract. The introduction of this extrinsic evidence was objected to by the defendants on the ground that it tended to vary, contradict and modify the terms of a written instrument in violation of the parol evidence rule. The rule, as announced and applied in repeated decisions of this Court, is that where the terms of a written instrument are unambiguous, clear and explicit, extrinsic evidence of statements of any of the parties to it made contemporaneously with or prior to its execution is inadmissible to contradict, add to, detract from, vary or explain its terms, in the absence of fraud, accident or mistake in its procurement. *Hurst* v. *Hurst,* 7 W. Va. 289; *Lockwood* v. *Holliday, Trustee,* 16 W. Va. 651; *Paxton* v. *Benedum-Trees Oil Co.,* 80 W. Va. 187, 94 S. E. 472; *Jones* v. *Kessler,* 98 W. Va. 1, 126 S. E. 344; *Collins* v. *Treat,* 108 W. Va. 443, 152 S. E. 305; *Central Trust Company* v. *Virginia Trust Company,* 120 W. Va. 23, 197 S. E. 12; *Colerider* v. *Central National Bank of Buckhannon,* 125 W. Va. 760, 25 S. E. 2d 903; *McCorkle* v. *Kincaid,* 121 Va. 546, 93 S. E. 642. Only in those instances in which a written instrument is ambiguous or doubtful in its meaning may extrinsic evidence be admitted to explain it. *Paxton* v. *Benedum-Trees Oil Company,* 80 W. Va. 187, 94 S. E. 472; *Uhl* v. *Ohio River Railroad Company,* 51 W. Va. 106, 41 S. E. 340; *Rowe Company* v. *Wallerstein,* 145 Va. 191, 133 S. E. 669. When a written contract is clear and unambiguous, the declarations of the parties, as to what they intended by the

language used, are inadmissible. *Collins* v. *Treat,* 108 W. Va. 443, 152 S. E. 205; *Lewis* v. *Welch Wholesale Flour and Feed Company,* 90 W. Va. 471, 111 S. E. 158; *Watson* v. *Buckhannon River Coal Company,* 95 W. Va. 164, 120 S. E. 390. Such writing must speak for itself, by its terms, without the aid of extrinsic evidence. *Smyth* v. *Brick Row Realty Company,* 97 W. Va. 40, 124 S. E. 499. Parol evidence, in a particular sense, and with reference to contracts, deeds, wills and other writings, is the same as extrinsic evidence which, as to any writing, is such as is not furnished by the document itself but is derived from outside sources. See Black's Law Dictionary, 3rd ed., 698, 699; *Sale* v. *Figg,* 164 Va. 402, 180 S. E. 173. The precept which is generally known as the parol evidence rule is not only regarded as a rule of evidence but also as a rule of substantive law. *Jones* v. *Kessler,* 98 W. Va. 1, 126 S. E. 344. The force and the effect of the rule are to require, in the absence of a showing of fraud, mistake or accident, the exclusion of extrinsic evidence by which a party undertakes to contradict, vary, add to, or subtract from the terms of a valid written agreement or instrument. Jones on Evidence, 4th ed., Vol. 2, paragraph 434. See Wigmore on Evidence, 3rd ed., Vol. IX, Section 2400, paragraph 2. Passing for the present the competency of these writings as bearing upon the issue of fraud in the procurement of the contract, presented by the cross bill portion of the answer of the defendants, the admissibility of the evidence to explain the contract must depend upon the existence of some ambiguity in its terms. To determine that question it is necessary to consider and discuss the language of its pertinent provisions.

In the first paragraph of the body of the contract it is stated that the trustees agree to pay to the firm, upon the execution of the agreement, the sum of twelve hundred dollars in full of services in all matters up to that time and that the firm agrees to accept that sum as payment in full for such services. This language is clear and free from any doubt or ambiguity. The language employed is plain and unmistakable and, when accorded its common

and ordinary meaning, clearly signified that whatever may have been the prior contentions of the respective parties with respect to the amount of the unpaid fees then earned, and claimed by the firm and owing to it, it agreed to accept the amount of twelve hundred dollars "as payment in full for such services." By so doing it necessarily compromised and settled its claim for any other or larger amount. The extrinsic evidence offered by the plaintiff to the effect that any unpaid balance of ten thousand dollars of the fifteen thousand dollars claimed and requested by the firm and by Sypher on the basis of seventy five hundred dollars to it and seventy five hundred dollars to him as a consideration for the agreement or any interest in the land is in contradiction of the plain language of the agreement on that point. If it had been the actual and final agreement of the parties that the share of the firm in this unpaid balance was the consideration for the agreement or for a one tenth interest or estate in the land a provision to that effect should have been, and, it must be presumed, would have been, incorporated in the written instrument. No such provision, however, was embodied in it. Though extrinsic evidence may be admitted to contradict the consideration recited in a written instrument or to show the actual consideration to be other than stated in it, such evidence may not be introduced for the purpose of showing that the instrument was not founded on a valuable consideration or to alter or contradict the meaning or the legal effect of the writing. *Hunt* v. *Hunt,* 91 W. Va. 685, 114 S. E. 283; *Baughman* v. *Hoffman,* 90 W. Va. 388, 110 S. E. 829; *Monongahela Tie and Lumber Co.* v. *Flannigan,* 77 W. Va. 162, 87 S. E. 161; *Rymer* v. *South Penn Oil Co.,* 54 W. Va. 530, 46 S. E. 559.

The contract of December 15, 1896, does not recite any consideration or even contain that term. The promises of the parties were a sufficient consideration to support the contract. *Banner Window Glass Company* v. *Barriat,* 85 W. Va. 750, 102 S. E. 726. The writings introduced by the plaintiffs do not purport to show that the unpaid

balance of the requested fee was the consideration for the contract. No attempt is made, by the extrinsic evidence introduced, to contradict or explain the statement in the contract that the twelve hundred dollars were agreed to be paid by the trustees or accepted by the firm. The effort is to show that the payment and the acceptance of that amount were for a purpose other than that stated in the agreement. This can not be done by extrinsic evidence. It will not do to say that the incorporation in the contract of a provision which would have vested title, legal or equitable, in the firm to an undivided interest or estate in the lands would have divested the trustees of the legal title and caused complications in that respect and, for that reason, a provision of that kind was omitted. That contention concedes that such provision was, for reasons satisfactory to the parties, excluded. Had it been the intention of the parties to vest in or confer upon the firm an equitable interest or estate in the lands a suitable provision could, and, it must be presumed, would have been inserted which would have made that intention clear and, at the same time, have avoided any complication concerning a transfer of the legal title. It must be remembered that the contract was negotiated by lawyers experienced in the preparation of valid legal instruments. It appears that the contract was originally drafted by an able member of the firm in its behalf. It was then forwarded to the trustees and submitted to their counsel one of whom objected to it in its original form and at his suggestion it was not signed by them until a provision relative to its authorization by the beneficiaries was added. It was again examined and approved and signed by the firm and acknowledged by all its members, each of whom was an able and experienced lawyer. It is impossible to conclude that the omission from the contract of a provision to vest the firm with an equitable interest in the land rested on any theory other than that the parties purposely omitted it and that it was their intention that no such interest should vest in or be conferred upon the firm.

As to the provisions of the contract relating to the employment of the firm and its payment for future legal services, the language of the contract is also plain and unmistakable. In the third paragraph the agreement is that the firm is "to continue to represent as their attorneys the parties of the first part and their successors as Trustees and the beneficiaries in the trust, in all suits and matters pertaining to the lands * * * so long as said lands, or any part thereof, shall be owned by said parties of the first part, their successors or the beneficiaries aforesaid, and that the parties of the second part in full payment of their services aforesaid shall be paid all travelling expenses incurred by them in attending to the said business and also ten per cent (10%) of all sums which shall be hereafter received by the said parties of the first part, their successors or said beneficiaries (it being understood and agreed as to said beneficiaries as is hereinafter expressed) in payment for damages and from leases or sales of the timber on or minerals in said lands, and from leases and sales of said lands, or any part of them, after deducting from the sums which shall be received by the said parties of the first part, their successors or said beneficiaries, * * * and after also deducting any and all payments which shall hereafter be made by said trustees, their successors or said beneficiaries in settlements with other claimants of said lands, or any part of them, and also after deducting any expenses paid to the said parties of the second part, as hereinbefore provided. It being understood and agreed that the trustees having paid to the parties of the second part the ten per centum herein named that then the ninety per centum remaining for distribution among the beneficiaries shall not in the said beneficiaries hands be subject to any further payment to the parties of the second part."

The paragraph immediately following the provision just quoted then provides: "It being understood and agreed that the parties of the first part, in making this agreement, are acting as Trustees under a Deed of Trust dated the twenty-first day of November A. D. 1882, recorded in

Wyoming County, West Virginia, September 7th, A. D. 1889, in the office of the County Clerk and that they are promising only to the extent that they are warranted in so doing by the deed and by virtue of an authorization in these words: I, the undersigned, a shareholder of the lands * * * hereby consent to the arrangement made by the Trustees that for future Legal Services a sum equal to ten per cent of all moneys to be received by said Trustees or their successors from the sale of the lands and lumber, from damages, leases, etc., shall be paid to Messrs. Couch, Flournoy & Price of Charleston, West Virginia, and J. R. Sypher of Philadelphia in the proportion of 7-1/2 per cent to Couch, Flournoy & Price, and 2-1/2 per cent to J. R. Sypher."

It is difficult to conceive language more clear, plain, unambiguous and concise in providing payment to the firm in money, and not by an interest, legal or equitable, in the lands, for the future legal services to be rendered by it. The terms used express, clearly and unequivocally, the intention of the owners of the land, not to pay the firm for its future services in land or to vest in or confer upon it any interest or estate in the land, but to pay for the services in money, derived from the proceeds of the land and to pay them in no other way. The provision whereby, after the payment to the firm of the ten per cent of the net proceeds derived from the land, the ninety per cent of the proceeds remaining for distribution among the beneficiaries should not in their hands be subject to any further payment to the firm, in effect made it a creditor of the owners with respect to the ten per cent which it was to receive, and required the payment of the ten per cent before the remainder was subject to distribution among the owners. This provision places the firm and the owners in different classes and creates a different status for each class. Before the owners can distribute the proceeds derived from their lands they must pay the one tenth part of the total net proceeds owned by them to the firm. This provision clearly refutes the contention of the plaintiffs that the firm was the owner of

a one tenth interest in the lands, and the extrinsic evidence offered by the plaintiffs to establish the ownership by the firm of a one tenth interest in the land is in plain conflict with the language of the written contract in that respect.

The language of the contract also by clear implication indicates that the trustees were without authority to vest any interest in the lands in the firm and that the firm recognized the desirability, if not the necessity, of the authorization by the beneficiaries of the agreement of the trustees, not to vest any interest in the lands in the firm but instead to pay it from the proceeds derived from the lands, the ownership of which remained unchanged, and that the authorization in the agreement was incorporated in it for that purpose and was intended to have that effect.

If it had been the intention of the parties to the agreement to vest in the firm an estate or interest, legal or equitable, in payment for its future services or as consideration for the contract, how simple and easy would have been the incorporation in it, by its skillful draftsmen, of a provision to that effect instead of employing language which clearly set forth an entirely different means and method of payment.

It is now too late, after the lapse of many years, or at any time after the making of the written agreement, to undertake, by extrinsic evidence of statements or declarations of the parties, to explain, add to, detract from, contradict, vary, alter or modify its plain, explicit and unambiguous language or to seek, by such evidence, to give to it a meaning different from that which its terms used in their common and ordinary significance clearly express. The contract being free from ambiguity, the evidence introduced by the plaintiffs to establish the meaning for which they contend and which necessarily tends to explain, contradict and alter its terms and provisions, is inadmissible for that purpose. It is true that the rule is recognized in this jurisdiction and generally that when the language used in a written instrument is susceptible

of more than one interpretation, courts will look at the surrounding circumstances which exist at the time a contract in writing was entered into, the situation of the parties, and the subject matter of the instrument and, when the words are ambiguous, will call in aid the acts done under it as a clue to the intention of the parties. *Raleigh Lumber Co.* v. *Wilson,* 69 W. Va. 598, 72 S. E. 651; *Crislip* v. *Cain,* 19 W. Va. 438; *Hurst* v. *Hurst,* 7 W. Va. 289. But this rule applies only when the language of the written instrument is subject to more than one interpretation, or when its terms are ambiguous. *Griffin* v. *Fairmont Coal Co.,* 59 W. Va. 480, 53 S. E. 24, 2 L. R. A., N. S., 1115. It can not be applied to the plain and unambiguous language of the contract in this suit. When there is no imperfection or ambiguity in the language of a written contract, it will be deemed to express the entire and exact meaning of the parties, and every material part of the agreement will be presumed to have been expressed in it. Jones on Evidence, 4th ed., Vol. II, paragraph 434; *Central Trust Company* v. *Virginia Trust Company,* 120 W. Va. 23, 197 S. E. 12; *Jones* v. *Kessler,* 98 W. Va. 1, 126 S. E. 344.

The evidence, however, in so far as it tends to rebut the allegations in the cross bill portions of the answers of the defendants of fraud in the procurement of the written contract was properly admitted. The burden of proving the allegations of fraud was upon the defendants and this burden they have failed to carry. Fraud must be established, by him who alleges it, by clear and distinct proof. *Bennett* v. *Neff,* 130 W. Va. 121, 42 S. E. 2d 793. In the absence of such proof, or of any proof whatsoever, by the defendants, to support their allegations of fraud there was no necessity for the introduction by the plaintiffs of evidence to rebut them. Though the action of the circuit court in denying the claim of the defendants for the amount paid by them to the firm in excess of a fair and reasonable sum as compensation for the services rendered by the firm based upon the allegations of fraud in the cross bill portion of their answers, was assigned as error in the petition for appeal, that assignment was omitted

from the brief filed by them in this Court and was not relied upon in the oral argument in their behalf. Because of the failure of the defendants to support their allegations of fraud by the requisite proof and because of the clearly established recognition by the present trustees and their predecessors of the validity of the contract for nearly forty eight years from the time of its execution in 1896 until the filing of the answer in the nature of a cross bill in this suit in 1944, their claim of fraud in the procurement of the contract and of its consequent invalidity must fail. The action of the circuit court in denying the claim was plainly right.

When a written contract expresses the intent of the parties in clear and unambiguous language, the courts will not resort to construction but will give force and effect to the instrument according to its provisions, in the absence of fraud or other grounds which affect its enforcement as provided by its terms. 17 C. J. S., Contracts, Section 294; *Babcock Coal and Coke Company* v. *Brackens Creek Coal Land Company*, 128 W. Va. 676, 37 S. E. 2d 519, 163 A. L. R. 871. It is not the province of the court to alter, pervert or destroy the clear meaning and intent of the parties as plainly expressed in the written contract, or to make a new contract for them, by judicial construction of the instrument. 13 C. J. 525; 12 Am. Jur., Contracts, paragraph 229. "Where the terms of a writing are plain and unambiguous there is no room for construction, since the only office of judicial construction is to remove doubt and uncertainty". 12 Am. Jur., Contracts, paragraph 229. See *Adkins* v. *Aetna Life Insurance Co.*, 130 W. Va. 362, 43 S. E. 2d 372. When a written contract is unambiguous its meaning must be determined solely from its contents. *Cranes Nest Coal and Coke Co.* v. *Virginia Secony Coal and Coke Co.*, 105 Va. 785, 54 S. E. 884. The function of judicial construction of a written instrument is confined to the realm of ambiguity and there is no occasion for its exercise outside the limits of that sphere of inquiry. *Hamilton* v. *Rathbone*, 175 U. S. 414, 44 L. ed. 219, 20 S. Ct. 155; *Country Club of Portsmouth* v. *Wilkins*, 166 Va. 325, 186 S.

E. 23. "If a written contract is not ambiguous, it speaks for itself, and courts must carry its written words into effect." *Uhl* v. *Ohio River Railroad Company,* 51 W. Va. 106, 41 S. E. 340. See *Smyth* v. *Brick Row Realty Company,* 97 W. Va. 40, 124 S. E. 499; *Crislip* v. *Cain,* 19 W. Va. 438. It is the duty of the courts to construe contracts as they are made by the parties and to give full force and effect to the language used when it is clear, plain, simple and unambiguous. *Griffin* v. *Fairmont Coal Company,* 59 W. Va. 480, 53 S. E. 24, 2 L. R. A., N. S., 1115. When the terms of a written contract are clear and unambiguous, full force and effect will be given to the language used by the parties. *Strother* v. *McDowell County National Bank,* 113 W. Va. 75, 166 S. E. 818; *Babcock Coal and Coke Company* v. *Brackens Creek Coal Land Company,* 128 W. Va. 676, 37 S. E. 2d 519, 163 A. L. R. 871; *Adkins* v. *Aetna Life Insurance Co.,* 130 W. Va. 362, 43 S. E. 2d 372.

The contract here under consideration is not a contract by which an attorney was promised an interest in the amount of money collected upon a judgment rendered in an action in which he was employed by his client to collect the money, as was the contract in the case of *Bent* v. *Lipscomb,* 45 W. Va. 183, 31 S. E. 907, 72 Am. St. Rep. 815, or a contract by which an attorney was employed to collect a note and was promised a fixed portion of the amount he could collect, as was the contract in the case of *Mirasola* v. *Rodgers,* 120 W. Va. 685, 200 S. E. 30, 124 A. L. R. 504, cases cited and relied on by the plaintiffs in support of their contention that the contract in suit vested in the firm an equitable interest or estate in the lands. By neither of the contracts involved in those cases did the client promise to pay the attorney anything out of the collections or bind himself to pay the attorney any fee. In those agreements the compensation of the attorney was contingent upon his success in obtaining the judgment or in making the collection. The contract of December 15, 1896, was entered into after the title of the trustees to the lands had been established in them in a suit which the firm had prosecuted to a successful conclusion. It does

not contain a promise or an agreement to give the firm a stated percentage of the lands for recovering them or for establishing title to them in any single present or prospective proceeding. The promise is to pay them a designated percentage of the money to be derived from the lands, and it is not made to depend upon success or failure as a result of the services to be performed. If the services are rendered, regardless of the result, the firm must be paid for moneys obtained from damages, income from leases, and the proceeds of sale of the lands, when such moneys are received by the trustees or their successors. By the contract the trustees agreed to pay the firm, for its future services generally with respect to the lands as long as they owned them, "a sum equal to ten per cent of all moneys to be received by the trustees or their successors" from the lands which were then owned by the trustees, arising from damages, leases and sales, after making certain designated deductions from such moneys. It created and imposed that definite liability upon the trustees to the extent and in the manner clearly provided by its terms.

As the contract here in suit is plain and unambiguous, it will be given full force and effect according to its terms and provisions. Its legal effect is not to vest in the firm an interest or an estate in the lands of the trustees in exchange for its services, but to pay it for such services by moneys derived from the net proceeds of the lands. The contract, as so considered, is a contract for the performance of personal services. "Where the acts stipulated in an agreement require special knowledge, genius, skill, taste, ability, experience, judgment, discretion, integrity or other personal qualifications of one or both parties the agreement is said to be of a personal nature." *Kelley* v. *Thompson Land Company*, 112 W. Va. 454, 164 S. E. 667. The agreement required the exercise by the firm of most, if not all, of the foregoing personal qualifications. As stated in the *Kelley* case, it is the accepted rule that with respect to contracts of this character the death of a party who is required to render a personal service terminates

the contract. The contract, being of a personal nature, came to an end upon the death of Harrison B. Smith, the last surviving member of the firm, on October 18, 1942.

There is no merit in the contention of the plaintiffs that the decrees of the Circuit Court of McDowell County in the proceedings to confirm the sales of land made to Fordson Coal Company and to H. C. Booz are *res judicata* and conclusively establish an interest or an estate in the firm in the lands held by the trustees. The issues in those proceedings were not the same as the issue which arises under the contract in this suit. In order that the doctrine of *res judicata* may apply there must be concurrence of four things: identity in the thing sued for; identity of the cause of action; identity of the persons and of the parties to the action; and identity of the quality in the persons for or against whom the claim is made. *Collins* v. *Treat*, 108 W. Va. 443, 152 S. E. 205. These identities are not present in those proceedings and in this suit. No issue with respect to the meaning and the legal effect of the contract of December 15, 1896, was presented or decided in either of those proceedings. The purpose of those suits was to approve and confirm the sales and not to construe or enforce the written contract, as to which no issue was involved.

Numerous other contentions have been presented in the able and exhaustive brief filed in behalf of the plaintiffs, all of which have been carefully considered. In view of the conclusion reached upon the controlling question of the nature and the legal effect of the written agreement of December 15, 1896, it is unnecessary to state or to discuss them in this opinion.

For the reasons indicated the judgment of the Circuit Court of Wyoming County, in so far as it denies the claim of the defendants against the plaintiffs based upon fraud in the procurement of the contract, is affirmed, but in all other respects it is reversed; and this cause is remanded to that court for further proceedings in accordance with

the conclusions reached and the principles stated in this opinion.

*Affirmed in part; reversed in part; and remanded.*

Fox, PRESIDENT, dissenting:

I am unable to concur in the opinion of the majority in this case. In my opinion, the decree of the circuit court of Wyoming County should be modified in certain particulars to be hereinafter noted, and, as modified, affirmed.

At the outset, it should be borne in mind that there is no attempt on the part of anyone to vary or contradict the terms of a written agreement, and the single question involved in this litigation is whether the written agreement of December 15, 1896, hereinafter referred to as "agreement", should be construed as remaining in effect until the real estate mentioned therein has been fully disposed of; or as terminating on the death of the last surviving member of the firm of Couch, Flournoy and Price, which merely calls for a construction of the agreement as written, and on that single point. There is no ambiguity in the contract in respect to any other question which might arise therefrom. In the almost fifty-year period from the date of the agreement to the death of Harrison B. Smith in the year 1942, every provision thereof had been complied with by all the parties thereto.

I am in full agreement, in principle, with the four points of the syllabus prefixed to the majority opinion. The first three of those points are based upon the assumption that the contract of December 15, 1896, is unambiguous; in other words, that its meaning is so clear that extrinsic evidence attempting to explain its meaning cannot be accepted under what is known as the parol evidence rule. The fourth point of the syllabus merely states the general rule that a contract for personal service terminates upon the death of the person, or the member of a firm, whose services are contracted for. No one can take

issue with these general statements of law, but I think the case at bar is not one to which they are applicable. If the agreement under consideration is ambiguous, then, under all decisions with which I am acquainted, parol evidence is admissible to bring to light the conditions under which it was entered into, and the interpretation which the parties thereafter gave to the terms thereof, as shown by the manner in which they acted thereunder.

These principles are well settled, and I do not understand that they are questioned by anyone interested in this litigation. Along with other numerous authorities cited in the majority opinion on this question, reference may be had to *Central Trust Co.* v. *Virginia Trust Co.*, 120 W. Va. 23, 197 S. E. 12, in which this Court held: "In the absence of a showing of illegality, fraud, duress, mistake or insufficiency of consideration, the terms of an unambiguous written agreement may not be varied or contradicted by parol evidence of statements of any of the parties thereto made contemporaneously with or prior to the execution of such agreement."; and "An unambiguous written agreement entered into as the result of verbal or written negotiations will, in the absence of a showing of fraud or mistake, be conclusively presumed to represent the final agreement of the parties thereto, and may not be varied or contradicted by evidence of conversations or statements had or made at the time of or prior to its execution." I cite that case because it happens that the opinion therein was prepared by me for the Court. I have not changed the views then expressed.

In my opinion, the meaning of the agreement is not clear, and it is, therefore, ambiguous. Ambiguity is defined as "Doubtfulness; doubleness of meaning; indistinctness or uncertainty of meaning of an expression used in a written instrument." Black's Law Dictionary, Third Edition, 102. The majority opinion, being based upon the theory that there is no ambiguity in the agreement, and having agreed that on such theory the opinion of the majority is correct, it devolves upon me to state the reasons supporting the position that the agreement is am-

biguous to such an extent as justifies the introduction of parol evidence to show the circumstances under which it was prepared and executed, and the manner in which it was afterwards interpreted and acted upon by the interested parties. This I shall attempt to do.

The agreement is one between Charles S. Whelan, George F. Lasher and John Wagner, trustees, on the one part, and Couch, Flournoy and Price, attorneys-at-law, on the other part. No other party is involved under the provisions thereof requiring the performance of service, or in that provision which refers to payment for services theretofore performed. The parties of the second part, hereinafter referred to as "law firm", agreed with the parties of the first part, hereinafter referred to as "trustees" to continue to represent as their attorneys the trustees, their successors, and beneficiaries of the trust under which they were acting, in all suits and matters pertaining to the lands of the trustees located in McDowell and Wyoming counties, and to so represent them so long as said lands, or any part thereof, should be owned by them or by their beneficiaries. It then goes on to provide for their compensation of ten per cent of all moneys which might be "hereafter received" by the trustees from sales of land, leases, etc., after deducting from the amount so received all expenses and costs, and all taxes, and also any sums paid in settlement of other claims to said land, or any part of them. The last mentioned provision has some significance in connection with the interest in the land, if any, acquired by the law firm, because the effect thereof was to require the law firm to pay its share of any sums of money that might be necessary to be expended in perfecting the title to the said land. Under the agreement the law firm accepted the sum of twelve hundred dollars "in full of services in all matters up to this time", and as payment in full for such services. It then goes on to provide for their employment, and while it does not use the word "future" that meaning may fairly be implied, and in another part of the agreement the words "future legal services" are used. The trustees who executed the

agreement acted under a trust created November 21, 1882, under which the trustees were not permitted to dispose of any interest in the lands entrusted to them, without the consent of a majority of the beneficiaries thereunder, and, to authorize the agreement, written authority to the trustees to enter into the same was signed by a majority of the beneficiaries, and made a part of the agreement of December 15, 1896, and it is in that authorization that the words "future legal services" are used, and in which the beneficiaries of the 1882 trust consent to the arrangement then being made by the trustees for "future legal services," and that "a sum equal to ten per cent of all moneys to be received by said trustees or their successors from the sale of the lands and lumber, from damages, leases, etc., shall be paid to *Mess.* Couch, Fl*l*urnoy and Price of Charleston, West Virginia, and J. R. Sypher, of Philadelphia, in the proportion of 7-1/2% to Couch, Flournoy and Price, and 2-1/2% to J. R. Sypher."

When we study the agreement we find that there is no limitation therein as to the period during which the law firm should receive such share of receipts. In the majority opinion, much stress is laid upon the failure of the agreement specifically to provide for the situation which might arise in the event of the death of the members of the law firm before the sale of the land to which the agreement related; but it would have been just as easy to have limited the agreement to the lifetimes of the members of the law firm, had that been intended, and these two suggestions pretty much offset each other. The provisions of the agreement which impose on the trustees and their successors and the beneficiaries under the trust, the obligation to pay to the law firm ten per cent of the net proceeds derived from the land "hereafter received" or "received hereafter" are just as clearly and concisely stated as any statement relied on in the majority opinion. These statements are conflicting and inconsistent with each other. Different meanings may be argued therefrom, and this creates the exact situation in which a resort to explanatory parol evidence is warranted. Why favor one

clear statement over another of like character? Why not resort to extrinsic evidence to determine, if possible, what the parties to the agreement meant. No doubt all of the parties to the agreement had in mind that the lands would be disposed of during the lifetimes of the parties who executed the same, especially the members of the law firm, because by the terms of the agreement itself, the successors of the trustees were bound thereby.

As stated above, the members of the law firm were the only people required to perform any services, and they were the only people to whom the contract assured payment of compensation for services. There is nothing in the agreement which binds J. R. Sypher to perform any services, and nothing in the agreement proper that guarantees him any sum of money from the ten per cent provided to be paid; but the authorization to the trustees, aforesaid, made a part of the agreement, does specifically provide that of the ten per cent to be paid for "future legal services", three fourths should be paid to Couch, Flournoy and Price, and one-fourth to J. R. Sypher. Why was this provision put into the agreement? If we accept the theory of the majority opinion, the provision of the agreement under which Sypher was to receive a part of the ten per cent, provided to be paid, was a mere gratuity to him, because he was not required thereafter to perform any kind of service, and was no longer employed as an attorney for the trustees. This provision in the contract, together with the provision that "the intention being that the said parties of the second part shall receive ten per cent of all amounts received hereafter by the parties of the first part, their successors or by said beneficiaries * * * from said lands by way of damages, leases and sales, after deducting from said sums all taxes, charges, costs and expenses which shall hereafter be paid by said parties of the first part, or their successors to said beneficiaries", without any limitation as to the period during which such payments should be made, certainly calls for some explanation of what the parties really had in mind to do, and this can only come from a resort to extrinsic evidence.

I think it fair to argue that the purpose of the first clause of the agreement, in which the law firm agreed to accept twelve hundred dollars as payment in full for services theretofore performed, was intended to relieve the trustees from further cash payments on fees, and that it meant nothing more. A like settlement was made with Sypher, as appears from the record. The settlement between the trustees on the one hand, and the law firm and Sypher on the other, involved a cash payment of five thousand dollars on a claimed fee of fifteen thousand dollars for services rendered to the date of the agreement. It must not be forgotten that, under the majority opinion, all of the evidence touching the steps leading up to the execution of the contract is deemed admissible, as bearing upon the allegation of fraud contained in the answer and cross-bill of defendants. Of course, the majority would limit the use of this evidence to the question of fraud, but the evidence being in the case, on whatever pretext, is, in my opinion, there for all purposes, and should be considered on any question arising therein.

Assuming that this evidence is before the Court, even on the question of fraud; and further assuming that the Court has the right to look to it on other questions properly arising in the case; we find that the meaning of the agreement was not clear in the minds of one of the trustees who executed it, nor to their successors. It appears that the agreement was prepared by S. L. Flournoy, a member of the law firm; and that he died in 1904; and that thereafter matters pertaining to the agreement were handled by George E. Price. In January, 1911, Price wrote to Lasher, one of the trustees, suggesting the formation of a corporation, to which the 36,750 acres of land then owned by the trustees and here involved, should be conveyed, and stock issued to the beneficiaries for their respective interests in the properties included in the 1882 trust, and under this suggested plan the law firm would have received one-tenth of the stock, and although this suggestion, with immaterial variations, was made at subsequent dates, nothing ever came of it, but, so far as the

record discloses, it was never disputed that the law firm was entitled to such stock interest, in case the property should be conveyed to a corporation, and the trust closed in that manner. In 1913, Lasher, one of the trustees who signed the agreement, requested of Price his interpretation of the agreement, especially with reference to its termination. The position of the law firm on this point was promptly stated, that position being the same as that now asserted by the plaintiffs herein. Later, in April, 1917, John Gilbert, who had in the meantime become a trustee, made the same inquiry, to which the same answer was given; and in April, 1918, another letter was written by Price to Gilbert, giving advice on the proposed sale of the land to a corporation, in which he again made the same claim. Still later, in October, 1918, Price offered to reduce the law firm's supposed interest in the proceeds of sale to eight and one-half per cent of any stock issue, but still maintaining his original position that the firm was entitled to its ten per cent. Nothing ever came of this offer, or of the proposed organization of a corporation, and the offer was later withdrawn. Again in December, 1921, inquiry was made by the trustees at to what the law firm would be willing to accept for its interest in the agreement, to which Price replied and again insisted on the right of the law firm to ten per cent of the net proceeds of sale, and this position was also maintained in letters which followed in March and April, 1922. In 1923 and 1924, sales of some fifteen thousand acres, of the original 36,750-acre tract, were made to Fordson Coal Company and H. C. Booz, in separate transactions. To consummate these sales, it was necessary that there be a judicial determination on whether the proposed sales were approved by a majority of the beneficiaries, as required under the trust deed of 1882, under which the trustees were acting. In both of these proceedings, adjudicated in the Circuit Court of McDowell County, the law firm was made a party, appeared and answered, and was paid under the agreement. In 1938 the trustees, being still uncertain as to how the agreement should be interpreted, procured the advice of counsel in Philadelphia, who gave it as his

opinion that the contract would terminate on the death of the last surviving member of the law firm, the same position now taken by defendants, the appellants herein. So it is, that, from as early as 1913 to the date of the institution of this suit, there has been uncertainty, at least on the part of defendants, as to the meaning of the agreement. I think this strongly supports the theory that if the parties to the agreement were, themselves, in doubt as to the meaning thereof, there can be no impropriety in the introduction of parol evidence to explain the situation in which it was executed.

For these reasons, I am of the firm opinion that a reading of the agreement in its entirety creates grave doubt as to what the parties thereto really meant on the single issue presented on this appeal. The words "hereafter received" and "received hereafter" are in no wise limited. The provision in favor of Sypher is not explained by any language of the agreement, and we are left in doubt on this point. On the whole, I think the consideration by the trial court of the parol evidence introduced was proper. Fortunately for all concerned, that evidence is of a character which cannot be questioned. It consists, almost entirely, of correspondence between the parties, and court proceedings. The only testimony given by witnesses was on points affecting the identification of letters, and none of the parties questions either the identity or materiality of the evidence, although, of course, defendants have maintained throughout that the contract is clear and unambiguous, and that the evidence so taken cannot be read.

On the theory that the parol evidence appearing in the record should be considered, what do we find? It is unnecessary to stress the importance of the services performed by the law firm, in settling the title to a large portion of the 36,750 acres of land held by the trustees. That litigation began in 1890 and was not ended until 1896. It was first decided in the Circuit Court of the United States for the District of West Virginia, and later by the Circuit Court of Appeals for the Fourth Circuit. In effect, it cleared and settled the title to approximately

twenty-three thousand acres of land, although the title to about one-third of that acreage had been settled by compromise with one McCreery, after the suit was instituted. Up to that time, so far as appears from the record, the property was not income producing, and taxes and other expenses connected with the land were paid from assessments on the beneficiaries of the trust, under which the trustees held the land. When the litigation ended the law firm, and J. R. Sypher, claimed a fee of fifteen thousand dollars. I do not think that the record shows that there was any dispute over the amount of the fee, but the trustees were apparently unable to raise the money necessary to liquidate the fee in cash. It appears that previous to the date the fee was presented to the trustees for payment, there had been paid to the law firm approximately thirteen hundred dollars; and to Sypher about nine hundred sixty dollars. It appears that the trustees had funds available sufficient to pay to the law firm, and to Sypher, a sum of money, which, with what they had theretofore received, would amount to five thousand dollars. Some time during the negotiations over fees, which continued intermittently from May, 1896, until the date of the agreement, the suggestion was advanced that these cash payments were all that the trustees could make at that time, and the further suggestion was then made that the lawyers should look for payment of the balance of their fees through an agreement which would give them a percentage of the moneys thereafter received by the trustees, their successors, and their beneficiaries from sales of the lands, leases, etc. It was at first suggested by the law firm, and Sypher, that each receive ten per cent, or a total of twenty per cent, of any sums thereafter received from the land; but this was later reduced, and an agreement reached that payments be made in cash, which, with the payments theretofore made, would amount to five thousand dollars, and that the attorneys be assured of payment of the balance of their fees by a written agreement which would entitle them to ten per cent of all sums thereafter received from the land. In the meantime, Sypher had accepted a sum of money in full payment for

services to date, of the same general tenor as the agreement on that point between the trustees and the law firm. Therefore, the provision in the agreement under which Sypher was to have one-fourth of the ten per cent agreed to be paid, was either a pure gratuity to him, or was intended to compensate him for what the trustees felt they owed him on account of the balance of the fifteen thousand dollar fee, which had not been paid in cash. To me, it seems entirely clear that the authorization, aforesaid, which included the requirement that Sypher be paid a part of the ten per cent, was made to provide a bar against any claim by the law firm or Sypher to a further cash payment for services rendered prior to December 15, 1896, and was executed in consideration of the waiver on their part to any further cash claims, and the acceptance in lieu thereof of an interest in the proceeds that might thereafter be derived from sales of land or from other income therefrom.

If this be true, then the agreement of December 15, 1896, was not a simple contract for personal services. The law firm and Sypher surrendered ten thousand dollars which, it may be assumed, they could have collected in cash at that time, and, in lieu thereof, accepted the agreement out of which this litigation arises. Had the property been sold within a few years thereafter, it is unlikely that there ever would have arisen any question as to the interpretation of the agreement, and it would not have been considered an unreasonable one. It is the long lapse of time, the increase in values, brought about by the development of the country in which this large tract of land is situated, and the large sums of money which the law firm has received over a period of nearly fifty years, which seem to cause concern. In this connection, however, it appears that defendants, in order to sustain a theory, not now advanced on this appeal, vouch for evidence on the value of the services rendered to the trustees by the law firm, after the date of the agreement, which tend to show that the value of said services was approximately eighty thousand dollars; and

it does not require anything more than a simple calculation to determine that the sum of ten thousand dollars, if paid in 1896, and invested in real estate, or even allowed to accumulate at normal rates of interest, would, in the course of nearly fifty years, amount to a very large sum of money. Then to the extent that the increase in values has benefited the law firm, it has, to nine times greater extent, benefited the beneficiaries.

I am not concerned as to what we shall call the interest which I think the law firm obtained under this agreement. The plaintiffs' suit is based on the theory that under the agreement they became entitled to a vested equitable estate in fee simple, in an undivided one-tenth interest in the tract of 36,750 acres of land here involved, and that such interest vested at the date of the agreement. If that construction be given to the agreement, its benefits would pass to the heirs of the individual members of the law firm, as an interest in real estate. Whatever we may call the interest, it seems to me that, under the circumstances of the case, as disclosed by the record, and including the parol evidence produced, the agreement should be construed to give to the law firm, and the heirs, devisees, distributees or legatees of the individual members thereof, the right to the stipulated percentage until all of the said land had been disposed of, and whether it was disposed of in the lifetimes of the members of the firm, or after their deaths.

In my opinion, all parties to the agreement of December 15, 1896, contemplated that the land would be sold in the lifetimes of the members of the law firm. This probably accounts for the failure to be more specific, both as to the date of the expiration of the agreement, or as to any limitation on the time within which the payment of ten per cent would be required. Even if the parties did not have an express understanding on this point, the law assumes that as to any agreement which requires the performance of an act on the part of a party thereto, it is contemplated that the agreement and act will be performed within a reasonable time. The land here involved

was held by the trustees under a trust which, by its terms, contemplated that they dispose of the land when reasonable opportunity therefor presented itself; and when the agreement here involved was entered into, it was certainly contemplated that the land would be disposed of within a reasonable time, and within the lifetimes of the members of the law firm, most of whom were at that time men of middle life or younger.

It is not meant to be suggested or even intimated that the trustees have delayed sales of the land, in order to avoid paying to the law firm its interest in the sales provided to be paid under the agreement; but, clearly, giving to the agreement the meaning contended for in the majority opinion, the trustees could have delayed sale of the land, or any part thereof, and avoided payment of any sum of money to the law firm. They did not do that, as to a considerable part of the land, and there is nothing in the record to indicate that they have withheld sales with that purpose in later years. But the agreement should be construed as of its date, as preventing any such result to one of the parties thereto. The services performed by the law firm and Sypher were of such character, and of such an important nature, involving as they did, the very title to the greater part of the large tract of land held by the trustees, that they became, as a matter of equity, entitled to a substantial fee, gauged by the prevailing standard of fees at the time the agreement was executed. Their compensation for their services depended to a very great extent, on the good faith of the trustees in disposing of the land. They should not be deprived of that compensation through the failure of the trustees, whatever their motive, to dispose of the land within a reasonable time, and, therefore, equity will hold the trustees to the same responsibility to which they would have been held, had they sold the land within a reasonable time, and within the lifetimes of the members of the law firm. It is upon this theory of the case, coupled with the general equities of the case as they appear from the entire record, that I think the decree of the trial court should be affirmed. As stated above, I do

not contend that a mere contract for personal services can be continued after the death of the person who contracts to render that service. That is a general and well established rule; but, like all general rules, it has its exceptions, and I think this is one of them.

The agreement provided that the law firm should render legal services connected with the handling of sales or other disposals of this large boundary of land. That provision of the agreement cannot now be carried out, inasmuch as all of the members of the law firm are dead. The trustees still retain more than one-half of the original tract of land, and will, no doubt, require the services of counsel in connection with the future disposition thereof, as well as current requirements involved in the holding and protection of real estate. The trustees not being chargeable with any intent to delay the sale or other disposition of the land involved, and thus, according to their construction of the agreement, deprive the members of the law firm of their interest in the land under the agreement, it seems fair that the cost of legal services required subsequent to the date of the death of the last surviving member of the law firm, and which the members of the law firm, had they continued in life, would have been required to render, should be charged against the interest of the plaintiffs in the land, or in the proceeds therefrom.

I would therefore modify the decree of the Circuit Court of Wyoming County, and provide that the reasonable expenses for legal services, necessary to the protection and disposition of the remaining portion of said real estate, required subsequent to the date of the death of the last surviving member of the law firm, be charged against the interest of plaintiffs, in any future distribution of the ten per cent stipulated to be paid under the agreement, and, as modified, I would affirm the decree appealed from.