CENTRAL TRUST COMPANY, *Exr.,* *v.* VIRGINIA TRUST
COMPANY *et al.*

(No. 8670)

Submitted February 9, 1938.   Decided March 29, 1938.

*A. G. Thompson,* for appellant.

*George Poffenbarger* and *Harry V. Campbell,* for appellees.

FOX, JUDGE:

The Central Trust Company, executor of the last will and testament of W. D. Guyer, instituted its suit in the circuit court of Kanawha County against Virginia Trust Company, the heirs at law and creditors of W. D. Guyer, the general purpose of which was to bring about a settlement of his estate through the ascertainment of his indebtedness, and otherwise. The appellant herein, Little Fire Creek Coal & Coke Company, (hereinafter referred to as "Fire Creek") presented a claim against the estate, growing out of its alleged liability on account of a written agreement, dated the 2nd day of November, 1926, between the said Fire Creek on the one hand and W. D. Guyer, George R. Bullock and DeWitt Gallaher (hereinafter called "lessees") on the other. The court below denied the appellant a decree for any sum, from which action it appeals. The question involved herein is limited to the liability of the Guyer estate to Fire Creek.

On the 18th of December, 1880, Fire Creek leased to William Beury, for coal mining purposes, for a period of twenty years, a certain tract of coal situated near Thurmond in Fayette County, which lease was thereafter assigned to the Echo Coal & Coke Company; on February 20, 1899, it was extended for a term of twenty years from December 18, 1900, additional coal lands included therein, and minimum royalties provided for in the original lease increased from $2,000.00 annually to $4,000.00 annually; it was then transferred to Beury Brothers Coal & Coke Company, and on December 20, 1919, was extended until such time as the "recoverable merchantable coal in the premises * * * shall be mined and removed therefrom"; subsequently it was assigned to Beury Brothers Coal Company, and operations continued thereunder until about the year 1926, when, in an equity proceeding in the circuit court of Fayette County against the Beury Brothers Coal Company, the leasehold, and all property owned in connection therewith, was sold by a special commissioner and purchased by

Arthur B. Hodges, as trustee for Fire Creek and Kanawha Banking & Trust Company, at a price which, including costs of suit and expenses of sale, approximated the sum of $18,300.00. It appears from the record that while the said lease was being operated by the Beury Brothers Coal Company, a large indebtedness had accumulated, a part of which was represented by unpaid royalties due Fire Creek and its assignee, Kanawha Banking & Trust Company; and that among other indebtedness was a series of notes, each of the sum of $2,500.00, some of which were owned by W. D. Guyer, DeWitt Gallaher, Kanawha Banking & Trust Company and the National Bank of Thurmond. It also appears that Lewis, Hubbard & Company, for which W. D. Guyer was credit manager, also was a large creditor of the defunct coal company, and it is contended that Guyer acted on behalf of that company. This being the situation, W. D. Guyer, George R. Bullock, who was associated with the National Bank of Thurmond in some capacity and it is claimed acted for it, and DeWitt Gallaher, conceived the idea of effecting an organization for the purpose of taking over the said lease and continuing the operation of the mine located thereon. These negotiations began prior to the date of the purchase of the lease by Arthur B. Hodges, trustee, and continued after he had purchased the same and secured a deed therefor. A tentative agreement seems to have been reached with respect to this lease on or about the 2nd day of November, 1926. The negotiations leading up to the agreement made were carried on by Arthur B. Hodges, trustee, I. N. Smith, representing the Kanawha Banking & Trust Company, and H. B. Beury, representing Fire Creek on the one hand, and by W. D. Guyer, George R. Bullock and DeWitt Gallaher on the other. Beury, Smith and Guyer had died prior to the filing of the appellant's claim and their versions of what occurred during the negotiations hereafter referred to are not available. Hodges, Gallaher and Bullock testified. It is admitted by all parties that it was contemplated from the beginning of the ne-

gotiations that a corporation should be formed for the purpose of taking over the lease, and the name of the corporation was probably suggested by H. B. Beury, president of Fire Creek. The interest of Fire Creek and the Kanawha Banking & Trust Company was to have repaid to them the sum of $18,300.00 which they had expended in the purchase of the lease, and in addition thereto, Fire Creek was interested in securing a tenant who would develop the lease and pay royalties. It is conceded that Hodges, representing the Trust Company and Fire Creek, submitted three plans under which Guyer, Bullock and Gallaher could take over the lease, all of which involved payment to the beneficiaries of his trust of $18,300.00, either in cash or in notes to be executed by them; two of the plans submitted provided for the conveyance of the leasehold from Hodges, as trustee, direct to a corporation to be organized for the operation of the lease, which at that time was understood to take the name of Southern Smokeless Coal Company; the third, that the lease should be conveyed by Hodges to the lessees, individually, with the idea that they should convey the same to the Southern Smokeless Coal Company. Gallaher testifies that, during the negotiations leading up to the execution of the written agreement, and while Guyer and Bullock were present, the question of the personal liability of the lessees was brought up, and that Hodges, Smith and Beury each said, "You need have no apprehension about that. Your immediate conveyance following this conveyance to your company relieves you there." Bullock, when asked whether or not in any of the negotiations leading up to the transfer of the lease there was any suggestion that he, Gallaher and Guyer would be personally liable upon the lease, stated that "They never said anything about personal liability"; and when asked, "Was that question ever discussed in any conference in which you took part?", replied, "No, sir." Arthur B. Hodges was not asked about this conversation and made no statement with respect thereto. As a result of these negotiations, Hodges, as

trustee, by deed dated November 2, 1926, conveyed the leasehold and other property acquired by him under his purchase to the lessees, in consideration of the sum of $18,300.00, of which $10,500.00 was paid in cash and the residue was represented by separate notes, executed by the lessees payable to the Trust Company and Fire Creek, and secured by a deed of trust, executed by them, covering the property conveyed to them by said deed. On November 6, 1926, the lessees conveyed the same property to the Southern Smokeless Coal Company which, as a part of the consideration therefor, assumed the payment of the notes mentioned in the deed last above set out. Fire Creek acquired from the Beechwood Coal & Coke Company a tract of coal adjoining the Beury tract and, by deed dated the 2nd day of November, 1926, leased the same to the lessees, in which writing, signed by all of the parties to the same, the said lessees agreed as follows:

" * * * and the parties of the second part hereby covenant that they will work, mine and remove said coal in accordance with the terms, provisions, conditions and stipulations of the said lease made the 18th day of December, 1880, as subsequently changed and modified, and that they will fully and faithfully keep, observe, perform and comply with all of the terms, conditions, provisions and stipulations contained in said lease and the subsequent agreements or instruments changing and modifying the same, and that they will pay the party of the first part a royalty of Ten Cents ($.10) per ton for all coal mined from the premises thereby and hereby demised, which said royalty shall be payable in monthly installments on the 30th day of each and every month for the coal mined during the preceding month, and a minimum rent of Four Thousand Dollars ($4,000.00) per annum, which shall be paid in equal monthly installments on the 30th day of each and every month for the month immediately preceding, whether the royalty on the coal actually mined during such month shall equal such installment or not,

> but said rent of Four Thousand Dollars ($4,-000.00) per annum is not intended as an additional payment but merely as a minimum rent or royalty."

thus unconditionally assuming all the obligations of the original lease of December 18, 1880, as subsequently changed and modified, and especially to pay the minimum rent of $4,000.00 per annum. After the conveyance of the lease estate and other property to the Southern Smokeless Coal Company, that company executed a deed of trust dated the 2nd day of November, 1926, securing the payment of three series of notes; the first series, aggregating $13,098.21, payable in various amounts to the lessees, separately, represented money raised for working capital for the grantor; the second series, aggregating $18,300.00, payable to the same parties, represented the purchase price of the property paid to Arthur B. Hodges, trustee; and the third series, aggregating $22,500.00, represented money which said three parties and the Kanawha Banking & Trust Company had invested in securities of Beury Brothers Coal Company, one note of $10,000.00, payable to W. D. Guyer, a note of $5,000.00 to the National Bank of Thurmond, a note of $2500.00 to DeWitt Gallaher, and a note of $5,000.00 to the Kanawha Banking & Trust Company, the evident purpose being not only to secure the payment of money actually advanced to the Southern Smokeless Coal Company, but to recoup losses sustained in connection with the Beury Brothers Coal Company. All the papers connected with this transaction were dated in the month of November, 1926, but none of them was acknowledged and recorded before early in February, 1927, and the deed of trust last mentioned was not acknowledged until May 27, 1927, for reasons which are satisfactorily explained in the record. All of the writings are treated as being executed contemporaneously and as evidencing one complete transaction. *Oliver Typewriter Co. v. Huffman,* 65 W. Va. 51, 63 S. E. 1086.

After these papers were executed, the Southern Smoke-

less Coal Company, under the management of' George R. Bullock, entered upon the development of the leased property and continued to hold possession of the same until some time in the year 1931. On December 31, 1931, the lease was surrendered without prejudice to the rights of any of the parties in respect to rents and royalties then claimed to be due thereunder. The appellant, Fire Creek, filed its claim before a commissioner, which amounted to the sum of $13,207.87, as of December 31, 1931, and was based on minimum royalties claimed to be due from the lessees as of that date, and an item of taxes for the year 1927, the payment of which it is contended they assumed under the agreement aforesaid.

Appellant contends that by the agreement of November 2, 1926, the lessees unconditionally assumed the payment of the royalties and taxes accruing under the original lease, that the parol testimony tending to establish the defense to said claim is inadmissible to vary or contradict the terms of the agreement entered into by them, and that the rights of the parties must be determined under the terms of said agreement. The heirs at law and personal representative of W. D. Guyer contend (1) that the facts and circumstances surrounding the transfer of the leased premises to the Southern Smokeless Coal Company conclusively show that the lessees were not intended to be bound by the written contract, and that they were acting as agents for a known principal, to-wit, the Southern Smokeless Coal Company, and that it alone is responsible for the payment of the royalties and taxes sought to be recovered; (2) that the testimony of Gallaher that it was agreed that neither he nor his associates should be liable under the arrangements under which title to the said lease passed through them is admissible to show the understanding and agreement of the parties, and the capacity in which the lessees acted; and (3) that there was not, during the period for which royalties are claimed, any recoverable merchantable coal in the leased premises, and that therefore no recovery can be had for minimum royalties. In this connection,

it may be proper to say that royalties on all coal actually mined have been paid.

There is testimony tending to show the absence of recoverable and merchantable coal in the leased premises at the time the royalties contended for accrued. However, it is clear from the record that the lessees retained the possession of and operated the leased premises well up into the year 1931, and did not formally surrender the lease until the end of that year. Whatever their rights with respect to avoidance of royalties may have been, under the provision of the lease which extended its life to such time as the recoverable and merchantable coal could be removed, they were not in a position to assert those rights as to the period when they held possession of the property. They were rights which could only be invoked when they ceased to operate the property and gave notice of its surrender by reason of the absence of recoverable and merchantable coal.

The other points raised are not easily separable and will, therefore, be considered together. They are all involved in the question of whether or not the terms of a written agreement may be contradicted or varied by parol testimony. Whether that testimony bears upon the circumstances surrounding the transaction in the first instance, for upon the question of agency of Guyer and others, we ultimately fall back upon the question as to whether or not the terms of the written agreement shall stand as written. It must be borne in mind that here a radical change in the written agreement is contended for; that contention involves nothing less than the change of the parties liable thereunder by the substitution of the Southern Smokeless Coal Company for W. D. Guyer, George R. Bullock and DeWitt Gallaher. No more radical change in the terms of the contract can be conceived, and, under such circumstances, we are reluctant to give countenance to any rule which would depart from the time-honored principle that, in the absence of ambiguity in a contract itself, or fraud in its procurement or mistake in setting out the terms thereof, parol evidence will

not be heard to vary or contradict the same. This principle is well illustrated by *Long v. Perine*, 41 W. Va. 314, 23 S. E. 611, wherein it was held that:

> "A writing being the repository of the true final agreement of the parties to it, and the highest and safest evidence of it, in the absence of fraud or mistake, oral evidence of prior or contemporaneous conversations or stipulations, will not be admitted, to incorporate them in it, so as to add to, alter, or contradict the agreement spoken by the writing.'

*Lockwood* v. *Holliday*, 16 W. Va. 651; *Howell* v. *Behler*, 41 W. Va. 610, 24 S. E. 646; *Ins. Co.* v. *Board of Education*, 49 W. Va. 360, 38 S. E. 679; *Ryan* v. *Nuce*, 67 W. Va. 485, 68 S. E. 110; *Ballengee* v. *Beckley Coal & Supply Co.*, 111 W. Va. 304, 161 S. E. 562; *Capital City Bank* v. *Foster*, 112 W. Va. 520, 165 S. E. 802; *O'Farrell* v. *Service Co.*, 115 W. Va. 502, 177 S. E. 304. See also *Deitz* v. *Ins. Co.*, 31 W. Va. 851, 8 S. E. 616, 619, 13 Am. St. Rep. 909, wherein Judge Snyder, speaking for this court, and discussing the parol evidence rule, said: "But the true rule, it is submitted, is that parol evidence is admissible for the purpose of introducing a new party, but never for discharging an apparent party to the contract." In that notable case, *Crislip* v. *Cain*, 19 W. Va. 438, Judge Green lays down the following rule governing the use of parol evidence to vary or contradict the terms of a written agreement:

> "A court of equity may reform a written contract, where the suit is brought for the purpose, and it is alleged, that by fraud, accident or mistake of the scribe or by some other means the real agreement of the parties was not that, which is expressed in such written agreement; but except when such a suit as this is brought, no parol evidence can be introduced to explain, alter or modify in any manner a written agreement.
>
> "To this rule there is one exception, that is, when on the face of the written contract the

meaning of the parties is ambiguous. In such case the situation of the parties, the circumstances surrounding them, when the contract was entered into, and their conduct subsequently in carrying into effect the written contract may be received as evidence; but this is the only character of parol evidence, which can be received to show the real intention of the parties in such ambiguous contract, and all other, such as the verbal declarations of parties, must be excluded."

See also *Hukill* v. *Guffey*, 37 W. Va. 425, 16 S. E. 544. The rule with respect to the extent to which such evidence may go in a proper case is illustrated by *Uhl* v. *Railroad Company*, 51 W. Va. 106, 41 S. E. 340, wherein the court, speaking through Judge Brannon, held:

"If a writing is not ambiguous, it must speak for itself by its words, without aid of any oral evidence; but if it is ambiguous, oral evidence is admissible to show the occasion of the contract, the situation of the parties, the circumstances surrounding them, their subsequent acts in executing the contract, in order to show their intention in making it; but evidence cannot be received to show their declarations, conversations or interlocutions before or at the execution of the contract."

See also *Titchenell* v. *Jackson*, 26 W. Va. 460; *Watson* v. *Buckhannon River Coal Company*, 95 W. Va. 164, 120 S. E. 390. It is not contended that the agreement involved in the case at bar is ambiguous, but if testimony of statements and conversations may not be heard in case of an ambiguous contract, for stronger reasons such statements cannot be heard to contradict a contract which is not ambiguous in its terms, and this rule would preclude consideration of the testimony of Gallaher as to statements claimed to have been made to him by Hodges, Smith and Beury, touching the liability of himself and associates under the arrangements then being entered into.

We have confined citation of authority to decisions of our own court, and we have not attempted to cite all the cases bearing on the question. Reference is made to 7 Michie's Digest 895, where there are numerous cases bearing on this subject. There is, of course, ample authority from other jurisdictions, and from textbooks, upholding the theory supported by our own authorities.

> "The execution of a contract in writing is deemed to supersede all the oral negotiations or stipulations concerning its terms and subject matter which preceded or accompanied the execution of the instrument, in the absence of accident, fraud, or mistake of fact; and any representation made prior to or contemporaneous with the execution of the written contract is held to be inadmissible to contradict, change or add to the terms plainly incorporated into and made a part of the written contract."

10 R. C. L. 1016, section 208. The rule prevails in equity as at law. 3 Story's Equity Jurisprudence 567, section 1986. The question is discussed in 5 Wigmore on Evidence, p. 288, section 2425, wherein it is explained that where parties negotiate at a distance by letters and telegraph, the contract cannot be fully determined until there is a final agreement on terms. It is then stated:

> "On the other hand, if instead of leaving the net effect of the negotiations to be gleaned from the mass of writings, a single document is finally drawn up to replace them and to embody their net effect, and is signed or otherwise adopted by the parties, this document will now alone represent the terms of the act. Instead of leaving the wheat mingled with the chaff, the wheat has been definitely selected and set apart in a single mass. The wheat existed there, no less before than now, but it has now been placed in a single receptacle by itself.

> "This process of embodying the terms of a jural act in a single memorial may be termed the Integration of the act, i. e. its formation

from scattered parts into an integral documentary unity. The practical consequence of this is that its scattered parts, in their former and inchoate shape, have no longer any jural effect; they are replaced by a single embodiment of the act. In other words: *When a jural act is embodied in a single memorial, all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act.*

"This principle is perfectly well settled in our law."

In Restatement of the Law on Contracts, section 228, it is stated that:

"An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted."

In Section 237, it is stated:

"Except as stated in sections 240 and 241 (not bearing on the writing under consideration), the integration of an agreement makes inoperative to add to or to vary the agreement all contemporaneous oral agreements relating to the same subject-matter; and also, unless the integration is void, or voidable and avoided, all prior oral or written agreements relating thereto. If either void or voidable and avoided, the integration leaves the operation of prior agreements unaffected."

Then follows section 238 of said Restatement which sets a limit on the prior or contemporaneous agreements which may be shown:

"Agreements prior to or contemporaneous with an integration are admissible in evidence (a) to establish the meaning of the integration when this is required for the application of the standards stated in sections 230 and 231 (relating to ambiguous contracts) ; (b) to prove facts

rendering the agreement void or voidable for illegality, fraud, duress, mistake or insufficiency of consideration; (c) to prove facts in a suit for rescission or reformation of the written agreement showing such mistake as affords ground for the desired remedy; (d) to prove facts in a suit for specific performance showing such mistake, oppression or unfairness as affords ground for that remedy."

Under sub-section (d) above quoted, it may be contended that the claim of the appellant is, in effect, an attempt to enforce the performance of a contract oppressive and unfair and that for that reason, this claim should be denied. We cannot say that there was any oppression or unfairness in the procurement of the contract which the appellant seeks to enforce. Those who took part in the negotiations leading up to this written agreement were men of experience and judgment, and presumably knew what they were doing. It is quite apparent that the lessees had great expectations as to the profits which would result from the venture upon which they were entering. This is evidenced by the fact that they were willing to expend in money and credit more than $30,000.00 in purchasing this lease and providing working capital. In addition to this, they expected to recoup losses aggregating for the three parties concerned, $17,500.00 Evidently they had no doubt about the success of the venture and, but for the testimony of Gallaher, it would seem doubtful whether they gave serious thought to their responsibility for royalties. The written agreement was entered into at a time when coal was selling at a high price, and the fact that a situation developed shortly thereafter which lessened opportunities for profit cannot be considered on this appeal. We cannot say that the parties who took over this lease and agreed to pay royalties were the only parties who might have been interested in the property. True, the outcome of the venture was unfortunate, but likewise were many other ventures entered into about that period. We

see nothing in this situation which calls for the intervention of a court of equity to extricate the lessees from the effect of their own written agreement, on the ground of unfairness, oppression, or any circumstances surrounding the execution of the agreement. Neither fraud nor mistake is alleged. There was no misrepresentation. All the parties who participated in the negotiations were fully acquainted with the situation. It would have been easy to have avoided this controversy, had the lessees elected to accept the propositions offered them in which their personal liability was not involved. While there is nothing in the record showing the exact nature of these propositions, we are given to understand that each proposition required the payment of the purchase money for the lease by the individuals who were acquiring it. The only explanation given of the reasons for the plan finally adopted was that in the event of large profits, it would serve to reduce income tax and facilitate the issuance of stock to the lessees. The execution of the deed of trust by the Southern Smokeless Coal Company to secure notes payable to the assignees of the lease and others may well have been another consideration, prompting the taking of title to the lease in the names of the lessees and their assumption of the obligations thereunder. Even the taking over of the lease by the lessees and their assumption of obligations thereof need not have continued their liability, had they secured the written consent of Fire Creek to the transfer of the lease to the Southern Smokeless Coal Company and the assumption by it of the royalties and taxes agreed to be paid under their contract. They did not follow the simple course of obtaining such a written agreement, but are now seeking to show by parol testimony facts and circumstances which would release them entirely from the effect of their act. Whatever injustice may be done to these parties through the enforcement of their written agreement, the ruling contended for is too high a price to pay to right the wrong, if there be a wrong, involved in such enforcement. To uphold the parol evi-

dence rule is necessary to modern business life. The faith which people have in written contracts must not be destroyed by permitting their contradiction by parol evidence, under the circumstances presented by this record. Nothing therein indicates that any party to the negotiations under question was attempting to take any advantage whatever, and good faith on the part of all concerned is assumed. A weakening of the rule would open the door to designing men, and evils against which both the common and statute law have attempted to guard would return to plague not only the courts of the land, but every person engaged in business in any way dependent upon written agreements.

In our discussion thus far, general principles have been considered with an attempt to apply them to the particular case before us, but there is authority which closely approximates the particular question at issue herein. In *Fentress* v. *Steele & Sons,* 110 Va. 578, 66 S. E. 870, it was held:

> "Where a contract for the purchase of machinery was contained entirely in letters passing between plaintiff and defendant individually without reference to a brick company as the real purchaser or without any intimation that plaintiff looked to any other than defendant for payment, oral evidence was inadmissible in an action for the contract price that at a meeting with plaintiff's agent defendant explained that he was organizing a company for manufacturing brick, and wanted to arrange to purchase machinery for the company, and that the company, when organized, would be the purchaser of the machinery."

and

> "Where defendant contracted individually to purchase certain machinery from plaintiff, the fact that before the purchase was consummated defendant explained that the machinery was purchased for a corporation he was organizing, which would then be the debtor, would not dis-

> charge defendant from liability on the contract,
> but would only make the corporation subse-
> quently organized jointly liable with him."

Counsel for the lessees say this case is not here applica-
ble and is not in harmony with cases cited by them, but
we are unable to take that view of the case. We think
it is closely analogous to the case at bar. There is ample
authority for the proposition that if the lessees became
liable under their contract, their assignment to the
Southern Smokeless Coal Company did not relieve them
from liability. *Farmers Bank* v. *Mutual Assurance So-
ciety*, 4 Leigh (Va.) 69; *Powell* v. *Hughes Orphanage*,
148 Va. 331, 138 S. E. 637; *Kanawha-Gauley Coal & Coke
Co.* v. *Sharp*, 73 W. Va. 427, 80 S. E. 781, 52 L. R. A.
(N. S.) 968, Ann. Cas. 1916 E., 786; *Wallace* v. *Coal Co.*,
83 W. Va. 321, 98 S. E. 293; 2 Am. Juris., 195, sec-
tion 243.

But it is most strongly urged that the lessees acted
only as agents for the Southern Smokeless Coal Com-
pany, a disclosed principal, and that the written agree-
ment was entered into with full knowledge of that situa-
tion on the part of all who participated therein, and that
Fire Creek is therefore estopped to assert its claim
against the lessees or any one of them. We are not im-
pressed with this contention. In the first place, as com-
monly understood, an agent is one who, having no per-
sonal interest in the subject matter of his agency, acts
for another, and does not profit from his activities ex-
cept as to such compensation as he may receive from his
principal, independently of the venture to which his
agency relates. Under such circumstances, and when the
agency is disclosed, there is no liability unless the agent
has agreed to be liable. *Smith* v. *Bond*, 25 W. Va. 387;
*Johnson* v. *Welch*, 42 W. Va. 18, 24 S. E. 585; *Davis* v.
*Fisher*, 90 W. Va. 417, 111 S.E. 155. Here no such situation
existed. The lessees expressly agreed to be liable. It
is true they had in mind the organization of a corpora-
tion to take over and operate the lease they were acquir-
ing, and that purpose was understood by all parties; but

that corporation was to be the instrumentality of the lessees. In truth, the beneficial ownership of the property did not change. It remained with them through stock ownership to the same extent as if the legal transfer from them to the corporation had not been made. If they were agents, for whom did they act? Who was their principal? To whom were they accountable? The answer is, a corporation in which they owned all of the stock. We recognize, of course, that the corporation organized under these circumstances became a legal entity, separate and distinct from the joint ownership in which the lease was held prior to the corporation's organization; but the fact remains that these men, if agents, were, to all intents and purposes, acting for themselves. It may be contended that this proposition involves a rending of the corporate veil and that this can only be done to prevent fraud or injustice; that no fraud or injustice on the part of the lessees has been developed in this case; and that, therefore, the corporate entity should be recognized for all purposes. We hold, however, that the factual situation, which is that the lessees, who are seeking to avoid the effect of their written agreement, through a shifting of liability to a corporation organized and controlled by them, can be properly considered upon the question of whether or not they were agents entitled to the protection they claim as against their written undertaking. We do not have to hold that there is such fraud and injustice as would warrant us in rending the corporate veil. As a matter of fact, there is nothing in the record indicating any character of fraud, by any party, in the transaction under inquiry, but we hold that under all the circumstances of the case, the claim of the lessees to be relieved of their obligation on grounds of their agency for the Southern Smokeless Coal Company will have to be denied.

The record before us affords a striking illustration of the wisdom of the parol evidence rule as we have come to understand and apply it. Of the six men who had a part in the negotiations leading up to the execution of

the written agreement under consideration, three died before the taking of the testimony bearing thereon—two, broadly speaking, representing the interests of the lessor, and one, those of the lessees. All three of the living participants in those negotiations testified in this case in behalf of the lessees. Two of them, while not directly contradicting each other, had a different recollection of what occurred as to a vital matter, and the other properly restrained by a sense of professional obligation did not make a statement on that particular matter, and was otherwise hampered in his testimony. Even if the testimony of these men was admissible, doubt would still exist as to what was intended. The frailty of human recollections and death have intervened to make uncertain what the parties had in mind. While the circumstances of the entire transaction furnish plausible grounds for the position taken by the lessees, it must be remembered that after all the negotiations had ended, all contentions explored, all conversations had and statements made, the parties deliberately embodied their final understanding of their agreement in a writing signed by all of them. If a written agreement, executed under such circumstances, is to be set aside as to a vital matter, of what value is a writing? All the authorities say that such a writing, unless there has been fraud or mistake, must be held to embody the agreement of the parties, and that evidence of what took place prior to its execution cannot be heard to vary or contradict its terms. Believing in the wisdom of this rule, and feeling that this is a case calling for its application, we hold that the court below was not warranted in considering the testimony of what occurred at the time of and before the execution of the written agreement to justify its decree disallowing the appellant's claim, and that, aside from such testimony, the facts and circumstances of the case did not warrant the decree complained of.

The decree of the circuit court of Kanawha County denying recovery to the appellant, Little Fire Creek Coal & Coke Company, will be reversed and the cause re-

manded for further proceedings not in conflict with this opinion.

*Reversed and remanded.*