960 F.2d 1265
 CHILDERS OIL COMPANY, INCORPORATED, a corporation; James E.
Childers, Jr.; Erma L. Childers, doing business
as Childers Short Stop, Plaintiffs-Appellants,
v.
EXXON CORPORATION, a corporation, Defendant-Appellee.
 No. 91-2598.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1991.
Decided April 3, 1992.
 
 Carl Lee Fletcher, Jr., Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., argued (David A. Faber, R. Scott Long, on brief), for plaintiffs-appellants.
 William R. O'Brien, Howrey & Simon, Washington, D.C., argued (Darren B. Bernhard, Gregory J. Commins, Jr., Howrey & Simon, Washington, D.C., Thomas B. Bennett, Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., William R. Hurt, Exxon Co., U.S.A., Houston, Tex., on brief), for defendant-appellee.
 Before HALL, NIEMEYER, and LUTTIG, Circuit Judges.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Childers Oil Company and James and Erma Childers d/b/a Short Stop[1] appeal the district court's grant of summary judgment for defendant Exxon Corporation in Childers' action for breach of contract, tortious interference with prospective business relations, and fraud, and on Exxon's counterclaims for trademark infringement, breach of contract, and recovery on a promissory note. Through a combination of waiver, the parol evidence rule, and the statute of limitations, the appellants are unable to recover. In addition, they offer no colorable defenses to Exxon's counterclaims. Accordingly, the judgment is affirmed.
 
 I.
 
 2
 The appellants are two businesses, both wholly owned by James and Erma Childers--Childers Oil Co., Inc., and Short Stop, a partnership. Childers Oil was formed in 1975 to operate a bulk fuel distributorship in Bluefield, West Virginia. Childers Oil initially sold Amoco products. Shortly after it began operations, Childers Oil built a new plant near Princeton, West Virginia, at the junction of two major highways--Interstate 77 and U.S. Route 460.
 
 
 3
 In January 1980, Childers Oil built a retail service station adjacent to its Princeton plant. It leased the station to the Short Stop partnership. The competition-less station prospered. In early 1982, however, Amoco announced its withdrawal from West Virginia. Mr. Childers learned of Amoco's action in his Sunday newspaper.
 
 
 4
 If Mr. Childers worried of not having a supplier, his fears were quickly erased. The very next day, William Lucas, a distributorship salesman for Exxon, telephoned Mr. Childers to express Exxon's interest in replacing Amoco as Childers Oil's supplier. At the time, Exxon had no retail outlets on Interstate 77 from Charleston, West Virginia, to Wytheville, Virginia--a stretch of over 120 miles--and it was interested in filling this lacuna in its competitive ubiquity.
 
 
 5
 Mr. and Mrs. Childers had one serious concern about Exxon. Exxon owned a tract of land 400 yards from Short Stop, and the Childers had heard rumors that Exxon planned to build a companyowned station there. The Childers did not want to become an Exxon distributor and then be forced to compete with another retail Exxon outlet.
 
 
 6
 A few days after the initial telephone call, Lucas came to the Childers Oil plant to discuss Exxon's proposal. Mr. Childers asked Lucas about Exxon's plans for its tract of land. According to Mr. Childers, Lucas promised that Exxon would not build a retail station on the tract if Childers Oil would sign an Exxon Distributor Agreement.[2] 2]
 
 
 7
 A few weeks passed. Then Lucas and his boss, Lowe Lunsford, paid Mr. Childers another visit. Again, Mr. Childers brought up his concern about Exxon's plans for its land. Lunsford assured him that the property was in Exxon's inactive "land bank," and Exxon had no plans to construct a station there.
 
 
 8
 Through the summer of 1982, Mr. Childers continued negotiations with Exxon. Both Lucas and Lunsford repeated their assurances that Exxon would not compete with Short Stop by building on its "land bank" tract.
 
 
 9
 On September 14, 1982, Childers Oil signed Exxon's standard Distributor Agreement. The agreement contains a boilerplate integration clause:
 
 
 10
 25. ENTIRE AGREEMENT: This writing is intended by the parties to be the final, complete and exclusive statement of their agreement about the matters covered herein. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT.
 
 
 11
 Mr. Childers asked that Exxon's promise not to compete be included in the agreement, but was told that no changes could be made in the form. He signed anyway. The agreement was to expire on March 31, 1984.
 
 
 12
 Within a few months, Mr. and Mrs. Childers began hearing new rumors that Exxon was planning to develop its property. Mr. Childers called Lunsford each time he heard such a rumor. At first, Lunsford said that he had heard nothing, but he later expressly stated that a company-owned station would not be built.
 
 
 13
 Sometime in late 1983, a contractor showed up at Childers Oil and said he was there for a pre-bid conference on the "new station." Mr. Childers told the contractor that he had no intention of building a new station. He immediately called Lunsford, who said that Exxon was "just getting some cost figures together" and was not actually planning to build.
 
 
 14
 Nonetheless, before the end of 1983, Exxon began construction of a station to compete with Short Stop. Mr. Childers called Lunsford at the first sign of construction. Lunsford said, "Jim, I am sorry, I didn't have the clout I thought I had, I couldn't prevent this from happening."
 
 
 15
 By June 1984, Exxon's retail service station was open for business. Short Stop's business immediately and sharply declined. On June 10, 1984, Mr. Childers appeared in front of the Small Business Subcommittee of the Joint Committee of Government and Finance of the West Virginia Legislature to complain of Exxon's conduct. To contravene Mr. Childers' complaint, Exxon sent a written response, with a cover letter signed by Lunsford, to members of the subcommittee on September 14, 1984. In it, Exxon asserted that it had always planned to build the station, and no one at Exxon had told Childers otherwise. Exxon's response was not sent to Mr. Childers, and he did not inquire about the subcommittee's handling of his complaint. In September 1988, at Mr. Childers' deposition, he first learned of the existence of this document.
 
 
 16
 If they desired relief through litigation, 1984 was the most apt moment for the Childers to have filed suit against Exxon. Instead, they took fateful steps toward financial and litigation ruin. In early 1984, with construction of the company station going on before their eyes, they signed a second distributorship agreement, substantively identical to and expressly superseding the first. This new agreement extended the Exxon franchise for three years. The Childers spent $700,000, most of it borrowed, turning Short Stop into an extravagant traveler's mecca. The new and improved Short Stop included an ice cream store, convenience store, delicatessen, separate restroom building, and a large increase in gasoline capacity.
 
 
 17
 The revenue of Short Stop could not keep up with the increased debt burden. In January 1986, Childers Oil's account with Exxon became delinquent (over thirty days late) in an amount exceeding $100,000. The parties agreed on a payment plan under which Childers Oil would pay the two oldest outstanding invoices each time it picked up a load of gasoline from Exxon. This repayment scheme did not work, however, because Childers Oil began purchasing gasoline from Pennzoil instead of Exxon, and thus avoided the triggering of two-for-one payments. Exxon soon exercised its contractual right to demand payment by cashier's check.
 
 
 18
 Things got even worse when Exxon learned that Childers Oil had sold Pennzoil gas under Exxon's trademark. On April 23, 1986, Exxon exercised its right under the Petroleum Marketing Practices Act[3] to terminate the franchise, effective July 24, 1986, because of the misbranding. The appellants admit the misbranding and the lawfulness of the franchise termination.
 
 
 19
 During the three-month window between notice and the effective date of the termination, Mr. and Mrs. Childers tried to sell Childers Oil to H.C. Lewis, an Exxon distributor in Welch, West Virginia. The Childers and Lewis agreed that Lewis would purchase Childers Oil and sell gas to Short Stop, which the Childers would continue to own. The agreement, however, was contingent on Exxon's increasing Lewis' allotment so that he would have enough gas to supply Short Stop. Because it had no more wish to entrust its trademark to the Childers indirectly as directly, Exxon refused to increase Lewis' allotment, and the proposed deal collapsed.
 
 
 20
 In October 1986, two months after termination of the franchise, the Childers still owed Exxon $224,168.27. They signed a promissory note providing for monthly payments and interest. They have made only small payments, and do not dispute the amount that they owe on the note.
 
 
 21
 On August 10, 1987, the Childers filed this suit against Exxon in district court. Jurisdiction rests on diversity of citizenship. They amended the complaint twice, the last time on March 24, 1989. The final complaint pled three claims: (1) breach of contract, (2) tortious interference with plaintiffs' prospective business relationship with Lewis, and (3) fraud. The fraud claim did not appear in earlier versions of the complaint.
 
 
 22
 Exxon counterclaimed for breach of the distributorship agreement, for trademark infringement, and to recover on the promissory note. At the conclusion of discovery, on September 15, 1989, Exxon moved for summary judgment on all claims and counterclaims. On June 27, 1991, the district court granted summary judgment for Exxon.
 
 
 23
 Plaintiffs appeal.
 
 II.
 
 24
 The substantive law of West Virginia applies to this diversity action. A concept central to the contract issues we must address--the parol evidence rule--is not, as its name may suggest, a procedural rule of evidence, but is rather a substantive component of West Virginia's law of contracts. United States v. Bethlehem Steel Co., 215 F.Supp. 62, 68 n. 12 (D.Md.1962), aff'd, 323 F.2d 655 (4th Cir.1963); Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc., 906 F.2d 169, 173 (5th Cir.1990); see Mohr v. Metro East Manufacturing Co., 711 F.2d 69, 72 (7th Cir.1983).
 
 
 25
 The district court held that the parol evidence rule barred use of Exxon's oral promises to vary the terms of the written distributorship agreement. See generally, Kanawha Banking and Trust Co. v. Gilbert, 131 W.Va. 88, 46 S.E.2d 225, 232-233 (1947); Cardinal State Bank v. Crook, 184 W.Va. 152, 399 S.E.2d 863, 866-867 (1990). Appellants proffer various exceptions to the rule, but none of them quite fit.A.
 
 
 26
 Fraudulent inducement is an exception to the parol evidence rule, because such evidence does not "alter or vary" the terms of the contract; instead, a party may avoid the contract altogether (through rescission) by showing that it was fraudulently procured. Central Trust Co. v. Virginia Trust Co., 120 W.Va. 23, 197 S.E. 12, 16 (1938); Foremost Guaranty Corp. v. Meritor Savings Bank, 910 F.2d 118, 123 (4th Cir.1990) (applying Virginia law). The Childers do not seek rescission of the distributorship agreement; they seek damages for breach of the alleged parol promise.
 
 B.
 
 27
 Appellants' argument that the no-competition promise was a collateral contract is unavailing as well. They do not identify the separate consideration for the collateral promise. The subject matter of the supposed collateral contract is very closely related to the distributorship agreement, and indeed, a covenant not to compete would naturally be a part of an integrated distributorship agreement. This close connection precludes a finding of a collateral contract. Jones v. Kessler, 98 W.Va. 1, 126 S.E. 344, 349 (1925). Finally, the agreement's integration clause emphasizes that no "ORAL UNDERSTANDINGS ... AFFECT[ ] IT."[4] The district court rightly rejected the collateral contract argument.
 
 C.
 
 28
 In direct contradiction to the collateral contract theory, appellants posit that the oral promise was additional consideration for the distributorship agreement. Where consideration is a mere recital (e.g. "one dollar and other good and valuable consideration"), parol evidence may establish what the actual consideration was. However, West Virginia law draws a line at enforcement of parol promises as "additional consideration." Kanawha Banking & Trust, 46 S.E.2d at 233-234. In a sense, every promise made in a contract is in "consideration" of the other party's promises, and the "additional consideration" exception would swallow the rule if it were applied as appellants suggest.
 
 D.
 
 29
 Finally, with full knowledge that Exxon had broken its promise not to compete, Childers entered into a new distribution agreement. This second agreement specifically states:
 
 
 30
 28. PRIOR AGREEMENT: This Agreement cancels and supersedes any prior agreements between the parties thereto, covering the purchase and sale of product(s) covered by this Agreement.
 
 
 31
 The parol term the Childers seek to enforce was, if anything, a part of the original distributorship agreement. Signing a new agreement that "cancels and supersedes" the former, with knowledge of a breach of the old agreement, is a clear waiver of that breach.
 
 
 32
 In sum, the Childers have no tenable breach of contract claim, and the summary judgment on that claim was proper.
 
 III.
 
 33
 The district court held that Exxon had an absolute right to refuse to increase Lewis' allotment, and its refusal can never be "tortious interference" with the proposed Lewis-Childers transaction. Restatement (Second) of Torts § 766, comment b; Torbett v. Wheeling Dollar Savings & Trust Co., 173 W.Va. 210, 314 S.E.2d 166, 171-173 (1983) (relying on Restatement definition).
 
 
 34
 We agree with the district court, for the reason it gave and more. Tortious interference claims lie only against a party that is a stranger to the relationship. Torbett, 314 S.E.2d at 173. Exxon would have been the supplier of the fuel that was the subject of the proposed transaction, it would have had to license the use of its marks, and it would have derived profits from the sale of the product. Finally, even if Exxon were a stranger to the deal, and had some legal duty to supply the fuel, we think it was entitled as a matter of law to refuse to entrust its product to a person who had admitted prior misuse of its trademark. See Humboldt Oil Co. v. Exxon Co., USA, 823 F.2d 373, 375 (9th Cir.1987), cert. denied, 485 U.S. 1021, 108 S.Ct. 1575, 99 L.Ed.2d 890 (1988).
 
 IV.
 
 35
 The West Virginia statute of limitations for claims of fraud is two years. W.Va.Code § 55-2-12. The parties agree that if the statute of limitations began to run when the Childers learned that Exxon was going to build a company-owned station, the action is barred.[5]
 
 A.
 
 36
 Appellants, however, argue that they did not find out that Exxon knew its promise was false when made until September 1988, when, at his deposition, Mr. Childers was shown Exxon's 1984 letter to the state legislative subcommittee. Breaking a promise, without more, is only a breach of contract. Making a promise that is not intended to be kept may be a fraud, if the other elements of that tort are present. Janssen v. Carolina Lumber Co., 137 W.Va. 561, 73 S.E.2d 12, 17 (1952); Dyke v. Alleman, 130 W.Va. 519, 44 S.E.2d 587 (1947). Consequently, the Childers argue that they did not "discover" their fraud cause of action until Mr. Childers' deposition, and the statute of limitations did not begin to run until then.
 
 
 37
 Appellants assert that the possibility of sanctions under Fed.R.Civ.Pr. 11 is a strong deterrent to pleading fraud claims on bare suspicion that a broken promise was never intended to be kept. Appellees counter that Rule 9(b) permits intent to be pled generally, and, if fraud claims do not accrue until a smoking gun is in the plaintiff's hands, few claims will accrue until after a suit is filed and information in the defendant's possession is discovered. This debate, whether knowledge of so-called "legal" causation is required to begin the running of a statute of limitations, is not new to jurisprudence.
 
 
 38
 Two recent West Virginia cases provide guidance. In Hickman v. Grover, 178 W.Va. 249, 358 S.E.2d 810 (1987), the plaintiff had been injured by a bursting air tank. He sued a defendant, who then filed a third-party claim against the manufacturer of the tank. More than two years after the accident, the plaintiff attempted to assert a claim directly against the manufacturer. He asserted that the statute of limitations did not begin to run until he discovered that the tank was defective. The West Virginia court rejected his argument, 358 S.E.2d at 813-814:
 
 
 39
 In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the product, and (3) that the product had a causal relation to his injury.
 
 
 40
 * * * * * *
 
 
 41
 Hickman asks us to take this one step further. He suggests that we add another requirement, i.e., that the product was defective as a result of the conduct of its manufacturer. Indeed, this is a big requirement, because such knowledge is often not known with legal certainty until after the jury returns its verdict. At the very least, this knowledge would be very difficult to obtain, except during the discovery phase of trial. Thus, we would have a situation where the statute of limitations would almost never accrue until after the suit was filed. This would almost abrogate the statute of limitations in products liability claims. We cannot accept such a holding.
 
 
 42
 Hickman was followed by Stemple v. Dobson, 184 W.Va. 317, 400 S.E.2d 561 (1990), which imported its concepts into a fraud case. The court held, 400 S.E.2d at 565:
 
 
 43
 [W]e conclude that where a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury.
 
 
 44
 The court identifies the "injury" as the thing to be discovered, not that the defendant's state of mind or breach of duty may legally entitle the plaintiff to recover damages. The majority rule is the same. United States v. Kubrick, 444 U.S. 111, 118-125, 100 S.Ct. 352, 357-360, 62 L.Ed.2d 259 (1979)[6]; Phillips v. Amoco Oil Co., 799 F.2d 1464, 1469 (11th Cir.1986); Berkley v. American Cyanamid Co., 799 F.2d 995, 999 (5th Cir.1986).
 
 
 45
 The "discovery rule" tolls a statute of limitations until the plaintiff has, or ought to have, answers to two questions: Am I injured? Who injured me? Kubrick, 444 U.S. at 122, 100 S.Ct. at 359. At that point, the plaintiff has enough information to begin investigating his claims. Phillips, 799 F.2d at 1469 (fraud cause of action accrues "when the plaintiff should have discovered facts that would provoke a person of ordinary prudence to inquiry"); Berkley, 799 F.2d at 999 (fraud cause of action accrues when plaintiff knows of "falsity of defendant's statements and their relationship to the claimed injury"). He may not know enough to win a verdict or even file a complaint on that first day, but that is why the law gives him a reasonable limitations period to investigate. The appellants had sufficient knowledge to be put on a duty to inquire when Exxon built its company station. Lest the discovery rule abrogate West Virginia's fraud statute of limitations, we hold that the fraud claim is barred.
 
 B.
 
 46
 Appellants seize the Stemple court's comment that the point in time that a plaintiff discovers enough to start the clock running is a question of fact to be resolved by a jury. Appellants argue that the district court should have let a jury decide when the statute began to run.
 
 
 47
 We do not read Stemple to require submission of a statute of limitations defense on undisputed facts to a jury. Stemple was a pair of homeowners' appeal of a summary judgment entered against them in their suit against the prior owners for, among other things, fraudulently concealing severe termite damage to the structure. As we described above, the court identified the termite damage, and not the defendants' state of mind, as the thing to be discovered. 400 S.E.2d at 565. The court then surveyed the evidence in the case, which consisted of a series of events, each one of which would tend to cause more alarm in the plaintiffs. Inasmuch as application of the statute of limitations required identifying one of these discoveries as the proverbial straw that broke the camel's back, the court concluded, in reversing the summary judgment (400 S.E.2d at 566, emphasis added):
 
 
 48
 Clearly, reasonable persons could draw different conclusions from these facts.... Because there is a material question of fact with regard to when the plaintiffs' right of action accrued so as to commence the running of the statute of limitations, the matter was clearly a question for the jury.
 
 
 49
 In other words, if resolution of a statute of limitations defense presents a genuine question of material fact, a jury should resolve it. If not, a statute of limitations may be applied as a matter of law. Here, if Childers' knowledge of Exxon's state of mind were a prerequisite to the running of the statute, a jury might very well have to resolve whether Childers should have, with reasonable diligence, discovered the 1984 report to the legislative subcommittee sooner. However, because knowledge of the injury and the injurer is enough, and appellants admittedly had both more than two years before suit, there is no material issue of fact for a jury to resolve. Exxon is entitled to the benefit of its statute of limitations defense as a matter of law.[7]
 
 
 50
 The judgment of the district court is affirmed.
 
 
 51
 AFFIRMED.
 
 
 52
 LUTTIG, Circuit Judge, concurring in part and dissenting in part:
 
 
 53
 I concur in all but part IV of the court's opinion. The issue in part IV is whether appellants' fraud claim against Exxon is barred by the West Virginia statute of limitations. The dispositive question in resolving this issue is when, under West Virginia law, a fraud cause of action accrues. I cannot discern whether the majority correctly applies an incorrect rule of law or incorrectly applies the correct rule of law in resolving this question. I am convinced, however, that it has erred in one of these two respects, and in either event, has mistakenly concluded that appellants' fraud claim is barred by section 55-2-12 of the West Virginia Code. For this reason, I dissent from the court's holding in part IV.
 
 I.
 
 54
 I believe the better reading of the court's opinion is that it applies an incorrect rule of law in deciding when appellants' fraud cause of action accrued. The court holds, on the authority of Stemple v. Dobson, 184 W.Va. 317, 400 S.E.2d 561 (1990), that as a matter of law the statute of limitations began to run when appellants discovered that Exxon was building a competing service station, because on that day appellants knew that they had been injured and who had injured them. In so holding, the majority misreads Stemple as to the applicable rule governing accrual of causes of action in fraud cases. Stemple could not be clearer, in both its statement of West Virginia law and its application of that law to the facts before it, that the statute of limitations for fraud actions begins to run when the plaintiff knows or should know of the "nature of his injury," 400 S.E.2d at 565, not, as the majority holds, when he knows that he has been injured and who has injured him. Knowledge of the injury and knowledge of the injurer are necessary conditions for accrual of a fraud cause of action, but they are not sufficient conditions under West Virginia law.
 
 
 55
 The puzzling aspect of the court's opinion is that it correctly recites the applicable rule from Stemple, see ante at 1272, but then proceeds, without explanation, to inquire not as to when appellants knew of the nature of their injury, but as to when appellants knew that they had been injured and who had injured them. See ante at 1272 (" 'injury' [i]s the thing to be discovered"); ante at 1273 ("knowledge of the injury and the injurer is enough"). The only explanation for the court's failure to conduct the inquiry that it acknowledges is required under Stemple is its apparent belief that there is no distinction under West Virginia law between the time when one knows that he has been injured (and who has injured him) and the time when one knows the nature of his injury. It is plain from Stemple, however, that West Virginia does recognize such a distinction in fraud cases, and that the statute of limitations does not begin to run until the plaintiff knew or should have known of the nature of his injury. Not only does the opinion so state explicitly, see 400 S.E.2d at 565; cf. Sewell v. Gregory, 179 W.Va. 585, 371 S.E.2d 82, 84 (1988) (negligence case),[1] the court's disposition of the claim in that case confirms that this is the applicable rule.
 
 
 56
 In Stemple, the plaintiffs purchased a house in November 1985 after having been assured by the defendants that termites had not damaged the house's structure. Soon after moving in, the plaintiffs noticed flying insects in the house. An inspection in January 1986 disclosed termite damage to the exterior of the house. A subsequent inspection in February 1988 revealed substantial structural damage caused by the prior termite infestation. Plaintiffs brought their breach of contract and fraud action in April 1988, more than two years after the plaintiffs knew as a result of the initial termite inspection that they had been injured and by whom. The trial court granted the defendants' motion for summary judgment on the ground that the two-year limitations period began to run no later than the time the first inspection was conducted and thus had completely run before the plaintiffs commenced their suit.
 
 
 57
 The West Virginia Supreme Court of Appeals reversed. The court noted that the dispositive question was when the plaintiffs knew or should have known that there was substantial termite damage to the house. 400 S.E.2d at 565. It concluded that this was a question for the jury, notwithstanding that plaintiffs knew in January 1986 not only that they had been injured as a result of the prior infestation, but also that they had been injured by the sellers. The court reasoned that although the plaintiffs knew that they had been injured in January 1986, they did not at that time necessarily know or have reason to know of the nature of their injury--i.e., that they had been deceived when they were informed that there was no structural damage. Thus, it is clear from Stemple that mere knowledge of injury and injurer is insufficient to begin the running of the statute of limitations in a fraud action; if such knowledge were sufficient, the court would have affirmed the trial court's award of summary judgment in the defendants' favor. Instead, the plaintiff also must know or have reason to know of the nature of his injury.
 
 
 58
 I believe that, although appellants in this case knew that they were injured and by whom when Exxon began building the competing service station, they did not, as a matter of law, know or have reason to know at that time of the nature of the injury that underlay their fraud claim. The nature of the injury underlying a fraud claim is deception. See Stanley v. Sewell Coal Co., 169 W.Va. 72, 285 S.E.2d 679, 683 (1981) (fraud "consists of intentional deception"); see also Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (Frankfurter, J.) (statute of limitations in fraud case does not begin to run until plaintiffs "hav[e] discovered, or ha[ve] failed in reasonable diligence to discover, the alleged deception " (emphasis added)).[2] In my view, reasonable jurors could conclude that, although appellants knew or should have known when construction of the station began that Exxon had breached its contract, appellants did not have reason to know of the possibility of deception until they learned in 1988 that Exxon had always intended to build a competing station. Accordingly, I would reverse the district court's dismissal of appellants' fraud claim.
 
 II.
 
 59
 I believe for the aforementioned reasons that the majority simply applied an incorrect rule of law in rejecting appellants' fraud claim. But even were I to assume from the fact that the majority presumes the correctness of Stemple that it is actually applying the Stemple rule sub rosa,[3] I still could not join part IV of its opinion. For if it is applying the correct rule, it is applying it incorrectly.
 
 
 60
 If the majority is applying the correct rule, it clearly believes that Stemple dictates its conclusion that appellants should have been aware of the nature of their injury as a matter of law when construction of the competing service station began. This belief in turn seems to be premised on its assumptions first, that appellants' knowledge of the competing service station is analogous to the Stemple plaintiffs' knowledge of structural damage gained from their second termite inspection, and second, that the court in Stemple would have affirmed summary judgment for the defendants had the plaintiffs in that case brought their action more than two years after the second inspection. Stemple, however, does not dictate the conclusion reached by the majority, because a fundamentally different kind of fraud claim from appellants' was at issue in that case.
 
 
 61
 The alleged fraud in Stemple was misrepresentation not as to present intention about a future action, but as to a present fact--that at the time of purchase, the house did not have structural damage from the termite infestation. When the alleged misrepresentation is as to an existing fact, it is appropriate to hold, as a matter of law, that the plaintiff knew or should have known that he may have been deceived when he discovered that the facts were other than they were represented to be. However, where, as here, the alleged misrepresentation is as to present intention about a future action, it does not necessarily follow from the fact that the action is ultimately different from what was represented that the defendant misrepresented his intention. It could well be that the defendant intended to perform consistent with his representation, but changed his mind between the time of the promise and the time of expected performance. Under such circumstances, while as a matter of law the plaintiff perhaps should have known that the defendant had breached his contract, it is not necessarily the case that he also should have known that the defendant had committed fraud. As the majority recognizes, "[b]reaking a promise, without more, is only a breach of contract." Ante at 1271.
 
 
 62
 It is precisely because not every breach of contract necessarily entails fraud that courts require more than mere knowledge of breach before they will hold a plaintiff to knowledge of possible fraud for purposes of statutes of limitations. And it is because of this requirement of additional information beyond mere breach that the plaintiff's knowledge is generally held in such cases to be the quintessential jury issue. In Board of Educ. v. Plymouth Rubber Co., 82 Md.App. 9, 569 A.2d 1288, cert. denied, 320 Md. 505, 578 A.2d 778 (1990), for example, a school board brought a breach of contract action against a subcontractor who had agreed to perform any necessary repairs on a roof that the subcontractor had recently installed. The suit was instituted after the new roof had begun to leak, and the subcontractor had made a number of unsuccessful attempts to repair the roof. During discovery, one of the subcontractor's managers testified that despite having discovered soon after the roof was installed that it was irreparable and would have to be replaced, he recommended to the school board that the repair work continue. Based upon this testimony, the board sought to amend its complaint so as to include a fraud claim in addition to its contract claim. The subcontractor argued that the statute of limitations for the fraud claim had begun to run as soon as the school board discovered that the roof could not be repaired and would have to be replaced, and that the fraud claim was therefore time-barred.
 
 
 63
 The Maryland Court of Special Appeals rejected this argument. After stating that in Maryland, "limitations do not commence to run as to a tort claim until the plaintiff knows or reasonably should know of a basis for the cause of action asserted," the court held that until the deposition, the school board "had no reasonable basis to believe that [the subcontractor] had intentionally misrepresented to it the true condition of the ... roof in order to avoid replacing it," and that "[t]his alleged misrepresentation is the basis for [the board's] fraud ... claim[ ]." Id. at 1294.
 
 
 64
 Similarly, in Mister Donut of Am., Inc. v. Harris, 150 Ariz. 321, 723 P.2d 670 (1986), an Arizona doughnut franchisee was assured by his franchisor prior to executing their contract that the manufacturer of the doughnut mixes needed by the franchisee would soon be establishing a distributorship in Arizona. In 1980, nearly three years after the franchise opened, the franchisee discovered that the franchisor had known all along that the mix manufacturer would not be establishing a distributorship in Arizona, because a restrictive covenant prevented the manufacturer from doing business in that state.
 
 
 65
 The Arizona Supreme Court acknowledged that the statute of limitations for the franchisee's breach of contract claim may have begun to run as soon as it became apparent that the franchisor had failed to fulfill its promise that the mix manufacturer would establish a distributorship in Arizona. The court held, however, that the lower court had erred in concluding, as a matter of law, that the statute of limitations for the franchisee's fraud claim began to run on the same day:
 
 
 66
 Breach of contract and fraud are not the same and there can be one without the other or one before the other. That appears to be the case herein. There was evidence of breach of contract before ... 1980, but the evidence was such that the jury could find that fraud was not discovered or discoverable until [1980]....
 
 
 67
 Id. 723 P.2d at 673 (citation omitted).
 
 
 68
 I believe that West Virginia courts would recognize the significant difference between a claim based upon misrepresentation as to present intention about a future action, such as appellants', and a claim based upon misrepresentation as to an existing fact, such as that in Stemple, were they presented with the issue. I do not believe they would accept the majority's reasoning that the construction of the service station in this case is analogous to the second termite inspection in Stemple insofar as the accrual of appellants' fraud cause of action is concerned. In my view, they would hold, as did the courts in Plymouth Rubber and Mister Donut, that the statute of limitations for a fraud claim such as appellants' does not necessarily begin to run when the plaintiff knows that the defendant has broken his promise. Thus, even if I believed that the majority was applying the correct rule of West Virginia law, I would have to conclude that it was applying that rule incorrectly in holding that appellants' fraud claim is barred as a matter of law.
 
 III.
 
 69
 The rule of law announced by the court today may well immunize from suit many who have and will in the future defraud the citizens of West Virginia. The more likely consequence of the rule, however, is that every plaintiff alleging breach of contract will also allege fraud in the inducement--whether or not he has facts to support such a claim. If he does not, he risks that the statute will run before he even has reason to suspect he may have been defrauded. This would be unfortunate were it required by West Virginia law; it is all the more unfortunate because it is not.
 
 
 70
 I respectfully dissent.
 
 
 
 [1]
 This opinion will refer to the appellants collectively as "Childers," except where the context indicates otherwise
 
 
 [2]
 Exxon denies that this oral promise was made, but concedes that disputed issues of fact must be resolved in appellants' favor for purposes of Exxon's motion for summary judgment. Our recital of facts applies this rule, and we make no attempt to identify every fact that Exxon might controvert if the case were tried
 
 
 [3]
 15 U.S.C. §§ 2801-2841
 
 
 [4]
 Exxon also argues that if the promise not to compete were a freestanding contract independent of the distributorship agreement, it would be unenforceable under the Statute of Frauds, because any contract for a term of more than one year must be in writing. W.Va.Code, § 55-1-1(f) (1981 & Supp.1991). Exxon did not assert this defense below, however, and it was not considered by the district court. Because adequate alternate grounds for affirmance are present, we need not decide whether Exxon may interpose a statute of frauds defense for the first time on appeal
 
 
 [5]
 Mr. Childers admitted at his deposition that he knew Exxon had broken its promise, and that he felt he had been lied to, when construction of the station began
 
 
 [6]
 Kubrick was cited by the West Virginia court in a medical malpractice case, Harrison v. Seltzer, 165 W.Va. 366, 268 S.E.2d 312, 315 n. 2 (1980), where the court stated in dicta the rule it was later to explicitly adopt in Hickman:
 [W]here the adverse results of medical treatment are so extraordinary that the patient is immediately aware that something went wrong, ... the statute of limitations will begin to run once the extraordinary result is known to the plaintiff even though he may not be aware of the precise act of malpractice.
 Harrison, 268 S.E.2d at 315. West Virginia's medical malpractice/discovery rule jurisprudence is disproportionately replete with cases involving foreign objects left within a patient's body during surgery. Hill v. Clarke, 161 W.Va. 258, 241 S.E.2d 572 (1978); Morgan v. Grace Hospital, 149 W.Va. 783, 144 S.E.2d 156 (1965); Gray v. Wright, 142 W.Va. 490, 96 S.E.2d 671 (1957), overruled in part, Morgan, 144 S.E.2d at 161 (fraudulent concealment of object's presence by physician not required for discovery rule tolling); Baker v. Hendrix, 126 W.Va. 37, 27 S.E.2d 275 (1943). Inasmuch as discovery of such an object not only identifies the source of the injury, but also virtually establishes malpractice res ipsa loquitur, the Kubrick issue did not arise in those cases.
 
 
 [7]
 Without citation to authority, appellants assert that Exxon's counterclaim on the promissory note should have been held in abeyance pending resolution of appellants' claims "by a jury." Of course, the district court had disposed of appellants' claims on summary judgment when it ruled in Exxon's favor on the note, and the premise of their argument is rendered nugatory by our affirmance. Moreover, the Childers proffer no defense to collection of the note
 
 
 [1]
 The court in Stemple in fact stated at one point that the statute begins to run when the plaintiff knew or should have known of "the nature of [his] claims." 400 S.E.2d at 564 (emphasis added)
 
 
 [2]
 The majority believes that to require that a plaintiff know or have reason to know that he has been deceived (as opposed to merely injured) is to require that he know that he has a legal claim. See, e.g., ante at 1272 ("The court [in Stemple ] identifies the 'injury' as the thing to be discovered, not that the defendant's state of mind or breach of duty may legally entitle the plaintiff to recover damages."). Of course, this is not so. One can know of possible deception, yet have no idea whether he has a legal claim based upon that deception
 
 
 [3]
 The majority would have to maintain that Stemple was wrongly decided if it were applying the rule that it states it is applying